Jason D. Guinasso (SBN# 8478)
500 Damonte Ranch Pkwy, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
jguinasso@hutchlegal.com

Kristen K. Waggoner (AZ Bar 032382)*
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application forthcoming

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY,<br><br>*Plaintiff*,<br><br>v.<br><br>STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as Attorney General of Nevada; FRANK HUNEWILL, in his official capacity as Sheriff of Lyon County,<br><br>*Defendants*. | Case No.: 3:20-CV-00303-LRH-CLB<br><br>**VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. Four days after filing of the initial complaint in this case, Governor Steve Sisolak announced that Nevada would be moving into Phase 2 of the state's reopening plan on Friday, May 29. But instead of fixing the serious constitutional problems identified in the initial complaint, the Governor has chosen to make them worse.

2. The initial complaint challenged the Governor's emergency orders prohibiting churches and other places of worship from holding in-person worship services of ten or more people, even when such services could be held in accordance with social distancing and public health guidelines. In addition to spawning this lawsuit, that prohibition caused the U.S. Department of Justice on Monday to urge the Governor "to help preserve the Free Exercise Clause of the First Amendment by amending earlier Emergency Directives and remedying their unequal treatment of places of worship." DOJ Letter, May 25, 2020, attached as **Exhibit 1**. The Governor has failed to do so.

3. For over two months, Calvary Chapel Dayton Valley (the "Church") has been unable to hold an in-person worship service due to Covid-19 and the Governor's orders. The Church has patiently waited for Governor Sisolak to restore its First Amendment freedoms, trusting that the Governor would prioritize constitutional rights and allow churches to resume in-person worship services at the earliest opportunity.

4. But that trust has been shattered. Instead of prioritizing religious freedom, the Governor has moved "non-essential" secular businesses and activities to the front of the line and pushed churches towards the back. Even before his Phase 2 announcement, the Governor allowed restaurants and food establishments to resume in-person, on-site dining at 50% capacity, allowed all retail

establishments to open at 50% capacity, and threw open the doors of nail care salons, hair salons, and barber shops—businesses that the Governor's own orders say "promote extended periods of public interaction where the risk of [Covid-19] transmission is high."

5. Moreover, the Governor has now announced that the following "non-essential" businesses can reopen in Phase 2:

- Gyms and fitness facilities, including group fitness classes, up to 50% building capacity;
- Bars and taverns, up to 50% capacity;
- Salons and other businesses that provide aesthetic or skin services, including facials, hair removal, tanning, eyelash services, eyebrow threading, and salt therapy;
- Day and overnight spas;
- Massage services;
- Body art and piercing establishments;
- Aquatic facilities and swimming pools, up to 50% capacity;
- Water parks, up to 50% capacity;
- Museums, art galleries, zoos and aquariums, up to 50% capacity;
- Outdoor venues, like mini golf and amusement parks;
- Indoor venues, like movie theaters, bowling alleys, and indoor malls, up to 50% capacity; and
- Casinos (starting June 4).

6. Incredibly, the Governor's Phase 2 plan prohibits churches and places of worship from opening their doors to more than 50 people under any circumstance (the "Church Gathering Ban").

7. Regardless of the Governor's purported reasons for this disparate treatment, they cannot survive constitutional scrutiny. Under the Free Exercise Clause, a law is not generally applicable, and thus triggers strict scrutiny, when it "fail[s] to prohibit nonreligious conduct that endangers" the government's interest "in a similar or greater degree" than the prohibited religious conduct. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993). That is exactly what the exemptions under the Governor's orders do.

8. Indeed, under the Governor's orders, large numbers of people can gather for a similar or greater amount of time as a church service at restaurants, non-essential retail establishments, nail salons, hair salons, barber shops, gyms, fitness facilities, pools, water parks, museums, aquariums, amusement parks, indoor malls, bowling alleys, movie theaters, and casinos, but it is illegal for the Church—which is located in rural Lyon County—to hold in-person services with more than 50 people.

9. This is unconstitutional, and it makes no sense. As of May 25, 2020, Carson City Health and Human Services reports that Lyon County has only 12 active cases of Covid-19. *See* Lyon County Covid-19 Data, attached as **Exhibit 2**. With a population of approximately 57,510, that means the per capita rate of active Covid-19 infections in Lyon County is approximately 0.021%.

10. Consistent with its religious beliefs, the Church plans to resume in-person worship services on Sunday, May 31, and has developed comprehensive social distancing and health and safety protocols to govern those services. Despite these health and safety measures, however, the Governor's Church Gathering Ban threatens the Church with criminal and civil penalties.

11. Without a temporary restraining order and injunction, the Church will face criminal and civil penalties for assembling and worshipping God. A temporary

3

restraining order and injunction are therefore needed to preserve the Church's constitutional rights.

**JURISDICTION AND VENUE**

12.     This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983.

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

14.     This Court has authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202, the requested injunctive relief under 28 U.S.C. § 1343, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendants reside in this district.

**PARTIES**

16.     Calvary Chapel Dayton Valley (the "Church") is a nonprofit church organized exclusively for religious purposes within the meaning of § 501(c)(3) of the Internal Revenue Code. The Church is in Dayton, Nevada (Lyon County).

17.     Defendant Steve Sisolak is the Governor of Nevada. Governor Sisolak is responsible for issuing and enforcing the Church Gathering Ban. He is sued in his official capacity only.

18.     Defendant Aaron Ford is Nevada's Attorney General. Attorney General Ford is authorized to enforce and prosecute violations of the Church Gathering Ban. He is sued in his official capacity only.

19.     Defendant Frank Hunewill is the Sheriff of Lyon County. As Sheriff of Lyon County, Defendant Hunewill has the power, both personally and through his

4

subordinates, to enforce the Church Gathering Ban. He is sued in his official capacity only.

## FACTS

### Calvary Chapel Dayton Valley

20. Calvary Chapel Dayton Valley has operated as a Christian church in Dayton, Nevada since February 5, 2006.

21. The Church believes that the Bible is the inspired Word of God and infallible rule of faith and practice.

22. Thus, the Bible is the foundation upon which the Church operates and is the basis on which it is governed.

23. The Church believes, among other things, that the Bible commands Christians to gather together in person for corporate prayer, worship, and fellowship and that such assembly is necessary and good for the Church and its members' spiritual growth.

24. Consistent with that belief, the Church's mission and purpose is: (1) to continue steadfastly in the apostles' doctrine and fellowship, in the breaking of bread, and in prayers; (2) to worship God the Father, Son, and Holy Spirit; (3) to build up the Church of Jesus Christ through the teaching of the Word of God and the ministry of the Holy Spirit; and (4) to persuade men and women to repent and confess Jesus Christ as Lord.

### The Church's Response to Covid-19 and Plan to Resume In-Person Services

25. In response to federal, state, and local guidance at the beginning of the Covid-19 outbreak—but before any local or state order prohibited in-person gatherings—the Church voluntarily adopted rigorous social distancing and health safety measures for its services.

26. In fact, immediately after the Governor declared a state of emergency on March 12, the Church took proactive steps for its upcoming March 15 services.

27. The Church disinfected frequently touched surfaces such as door handles, chairs, and tables before and after services; made hand sanitizer available in multiple locations throughout the building's common areas; advised church attendees to refrain from personal contact such as handshakes and hugs; instructed those who felt sick or lived with someone who felt sick to stay home; and encouraged online giving through the Church's website, among other things.

28. And the next day, on March 16, 2020, the Church temporarily suspended in-person worship services and began streaming its services online.

29. More than two months later, the Governor's orders have prevented the Church from resuming in-person worship services.

30. Although the Church's initial decision to temporarily suspend in-person services was voluntary, and made in an abundance of caution given the health and safety concerns at the time, the Church believes it is called to resume in-person worship services, consistent with its religious beliefs about corporate prayer, worship, and fellowship.

31. The Church sincerely believes that online services and drive-in services do not meet the Bible's requirement that the Church meet together in person for corporate worship.

32. In addition, some of the Church's parishioners do not have internet access or the ability to participate in online services.

33. The Church thus plans to resume in-person worship services on May 31, 2020 (Pentecost Sunday), but the Church Gathering Ban makes such services illegal and would subject the Church to possible criminal and civil penalties.

34. Before Covid-19, the Church's two Sunday services could hold up to 200 people each.

35. The Church seeks to hold in-person services at 50% of its sanctuary's capacity while also providing for proper social distancing of at least six feet separation between families and individuals, which would amount to approximately 90 people in a service.

36. In preparation for resuming in-person worship services, the Church has adopted—and will follow—strict social distancing and health and safety protocols.

37. These protocols include the following precautions:

- Holding Sunday and Wednesday services;
- Strictly limiting Sunday services to 45 minutes (as opposed to the usual 90 minutes);
- Holding up to three services each Sunday to guarantee adequate space for social distancing at each service;
- Providing ½ hour between services to allow for thorough cleaning and sanitizing of sanctuary, hallways, bathrooms, and common surfaces;
- Posting signs on walls and floors to direct traffic;
- Posting signs on restroom doors limiting use to one person at a time;
- Posting signs in the restrooms encouraging proper washing of hands;
- Making hand sanitizer stations easily accessible to attendees;
- Encouraging attendees to arrive no earlier than 25 minutes before service;
- Using parking attendants to direct cars to designated parking areas;
- Directing all attendees to a designated entrance;

- Directing attendees to sanctuary seating designed to provide 6-feet of separation between families and individuals;
- Ensuring that all traffic for each service will be in one direction by using "first in, last out" model;
- Advising attendees of proper social distancing protocols;
- Encouraging attendees to bring and wear face coverings;
- Requiring all servants greeting or directing attendees to wear face coverings;
- Prohibiting any handouts or items to be passed to attendees during services;
- Prohibiting snacks or coffee from being served;
- Using prepacked Communion elements whenever served;
- Directing attendees out of the building to the parking area at the end of each service;
- Instructing attendees to refrain from congregating in the building.

### The Governor's Orders

38. On March 12, 2020, Governor Sisolak declared a state of emergency in response to the Covid-19 outbreak. *See* Declaration of Emergency, attached as **Exhibit 3**.

39. Noting that the Nevada Constitution gives him "[t]he supreme executive power of this State," Governor Sisolak "direct[ed] all state agencies to supplement the efforts of all impacted and threatened counties" and announced that he would "perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population." *Id.*

40. Five days later, on March 17, 2020, Governor Sisolak held a press conference and explained steps the State would be taking to mitigate the risks associated with Covid-19. *See* Press Release (Mar. 17, 2020), attached as **Exhibit 4**.

41. While Governor Sisolak encouraged "faith leaders" during that press conference "to find ways to deliver to your congregation without bringing them together in person," he assured them that he "cannot and will not say that places of worship should be closed." *Id.* at 4.

### *"Essential" and "Non-Essential" Businesses*

42. Three days later, Governor Sisolak issued an order mandating the closure of all "Non-Essential Businesses." *See* Declaration of Emergency Directive 003, attached as **Exhibit 5**.

43. The Governor's order defined "Non-Essential Businesses" to include, among other things, businesses that "promote recreational social gathering activities" and businesses that "promote extended periods of public interaction where the risk of [Covid-19] transmission is high," including "beauty shops, barber shops, [and] nail salons." *Id.*, §§ 1, 2.

44. Likewise, the Governor's order limited restaurants and food establishments to "take-out, drive-through, curbside pickup, [and] delivery" service and prohibited them from providing dine-in service to any customers. *Id.*, § 3.

45. The Governor's order did not close "Essential Licensed Business[es]" but rather encouraged them "to continue operation." *Id.*, § 4.

46. In addition, the Governor's order stated that "[t]he construction, mining, manufacturing, and infrastructure sector labor force may continue operations." *Id.*, § 6.

47. In connection with the Governor's order, the Nevada Department of Public Safety, Division of Emergency Management, adopted emergency regulations

further defining "essential" and "non-essential" businesses. *See* Emergency Regulations, March 20, 2020, attached as **Exhibit 6**.

48. Businesses not delineated in the Governor's order or in the emergency regulations could continue operations if they could "implement social distancing safeguards for the protection of their employees" and, "[t]o the extent practicable, provide services without causing members of the Nevada general public to congregate in a manner contrary to social distancing goals of a minimum of six feet of separation for more than incidental contact." Ex. 5, § 8.

49. Because neither the Governor's order nor the emergency regulations referenced churches or places of worship, they should have been allowed to continue operations and in-person services.

### *The Church Gathering Ban*

50. A few days later, Governor Sisolak issued another order—this time forbidding the "general public" from "gather[ing] in groups of ten or more in any indoor or outdoor area." Declaration of Emergency Directive 007, § 1, attached as **Exhibit 7**.

51. The Governor issued his stay-at-home order shortly thereafter. *See* Declaration of Emergency Directive 010, attached as **Exhibit 8**.

52. And even though Governor Sisolak assured faith leaders that he would not and could not close houses of worship, he later prohibited "[p]laces of worship" from "hold[ing] in-person worship services where ten or more persons may gather." Declaration of Emergency Directive 013, § 4, attached as **Exhibit 9**.

53. Related guidance from the Governor's office claimed that "this is not yet the time to get people together to celebrate their faith" and that "nobody should be physically attending in-person worship services." Guidance: Directive 013 (Apr. 8, 2020), attached as **Exhibit 10**.

54. Governor Sisolak continued to impose this ten-person restriction on churches during Phase 1 of the state's reopening plan. *See* Declaration of Emergency Directive 016, § 10, attached as **Exhibit 11**; Declaration of Emergency Directive 018, § 7, attached as **Exhibit 12**.

55. On May 26, 2020, Governor Sisolak announced that Nevada would be moving into Phase 2 of the state's reopening plan on Friday, May 29. *See* Press Release (May 26, 2020), attached as **Exhibit 13**.

56. Although the Governor announced that even more "non-essential" businesses and activities will be allowed in Phase 2, in-person worship services will be limited to no more than 50 people.

57. The Church Gathering Ban is indefinite.

### *Secular Exceptions to the Gathering Bans*

58. There are numerous secular exceptions to the Governor's gathering restrictions.

59. For one thing, the Governor's ban on gatherings of more than 50 people does not apply to persons working at or patronizing Essential Licensed Businesses or providing essential services to the public.

60. Thus, more than 50 people can gather for an extended period of time to, among other things, work at or patronize:

- "Essential infrastructure operations," including "airport[s]";
- "Businesses that ship or deliver goods directly to residences";
- "Banks and Financial Institutions";
- "Pawnbrokers";
- Businesses or entities that provide "social services for economically disadvantaged individuals, vulnerable populations, or victims of crime";

11

- "Laundromats and dry cleaners";
- "Warehouses and storage facilities";
- "Professional or technical services including legal, accounting, tax, payroll, real estate, and property management services";
- "Child care facilities"; and
- "Newspapers, television, radio, and other media services."

Ex. 6 (NAC 414.XXX(1)).

61. What is more, Governor Sisolak's "Phase One" order exempts some "non-essential" businesses and activities from the gathering restrictions. For example, the Governor's "Phase One" order allows:

- All restaurants and food establishments to resume onsite, in-person dining—up to "50% of the maximum seating capacity under normal circumstances";
- All retail businesses to reopen at 50% capacity;
- Auto showrooms, furniture showrooms, home furnishing showrooms, and appliance showrooms to reopen at 50% capacity;
- Cannabis dispensaries to resume in-person sales; and
- Nail care salons, hair salons, and barber shops to reopen.

Ex. 12, §§ 13, 15, 16, 17, 22; *see also* Ex. 9, § 3.

62. By allowing restaurants, food establishments, nail care salons, hair salons, and barber shops to reopen, the Governor has allowed businesses and entities to reopen that the State previously determined "promote extended periods of public interaction where the risk of [Covid-19] transmission is high." Ex. 5, § 2.

63. These exemptions continue during Phase 2 of the Governor's reopening plan.

64. In addition, the Governor has exempted the following "non-essential" businesses for Phase 2:

- Gyms and fitness facilities, including group fitness classes, up to 50% building capacity;
- Bars and taverns, up to 50% capacity;
- Salons and other businesses that provide aesthetic or skin services, including facials, hair removal, tanning, eyelash services, eyebrow threading, and salt therapy;
- Day and overnight spas;
- Massage services;
- Body art and piercing establishments;
- Aquatic facilities and swimming pools, up to 50% capacity;
- Water parks, up to 50% capacity;
- Museums, art galleries, zoos and aquariums, up to 50% capacity;
- Outdoor venues, like mini golf and amusement parks;
- Indoor venues, like movie theaters, bowling alleys, and indoor malls, up to 50% capacity; and
- Casinos (starting June 4).

Ex. 13; *see also* Road Map to Recovery Chart, attached as **Exhibit 14**.

65. Yet the Governor refuses to provide a similar accommodation to churches and other places of worship.

66. Nor has the Governor given any indication of when churches can expect to resume in-person services with more than 50 people.

67. In fact, on May 14, 2020, nearly 200 hundred churches (including Plaintiff) sent a letter to Governor Sisolak respectfully asking him to treat houses of worship equally and lift the ban on in-person worship services. At a press

conference the next day, and in response to a question about whether he received and read the letter from the churches, the Governor first answered no but then said he read "parts of the letter."

68. If the Church does not comply with the Governor's orders or emergency regulations, it would be "subject to criminal prosecution and civil penalties." Ex. 5, § 9; Ex. 7, § 5; *see also* Ex. 9, § 11.

69. The Nevada Attorney General and "[a]ll law enforcement agencies in the State of Nevada," including the Lyon County Sheriff's Office, are authorized to enforce the Governor's orders and the emergency regulations. Ex. 5, § 9; Ex. 7, § 5; *see also* Ex. 9, § 11.

70. Thus, Calvary Chapel Dayton Valley may not hold its planned in-person services without subjecting itself to criminal and civil penalties, even though its services would amount to less than 50% of the building's capacity and would adhere to strict social distancing and sanitation measures.

71. But Governor Sisolak does not have the authority under Nevada law to impose the Church Gathering Ban.

72. Rather, the power to investigate and quarantine people with communicable or infectious diseases is given to health authorities, not the Governor.

73. Without declaratory and injunctive relief, the Church's religious exercise will continue to be chilled and the Church will continue to suffer violations of its constitutional rights and irreparable harm.

## COUNT I

**Violation of the First Amendment to the U.S. Constitution**

**(Free Exercise)**

74. Plaintiff incorporates by reference paragraphs 1 through 73.

14

75. Plaintiff's sincerely held religious beliefs teach that the Bible is the inspired word of God and the sole authority for faith and practice.

76. Plaintiff sincerely believes that the Bible teaches the necessity of gathering together for corporate prayer, worship, and fellowship and that such assembly is necessary and good for the Church and its members' spiritual growth.

77. The Governor's Church Gathering Ban substantially burdens Plaintiff's religion by prohibiting it from holding in-person church services with more than 50 persons.

78. The Governor's Church Gathering Ban interferes with Plaintiff's religious autonomy and ability to carry out its religious doctrine, faith, and mission.

79. The Governor's Church Gathering Ban targets, discriminates against, and shows hostility towards churches, including Plaintiff.

80. The Governor's Church Gathering Ban is neither neutral nor generally applicable because it is riddled with exceptions and is based on a system of individualized assessments.

81. Defendants do not have a compelling reason for prohibiting Plaintiff's in-person church services when attendees can practice adequate social distancing, especially when compared to the numerous secular activities exempted under the Governor's orders.

82. Defendants have not selected the least restrictive means to further any purported interest.

83. The Church Gathering Ban violates the Free Exercise Clause of the First Amendment to the United States Constitution, both facially and as applied.

84. Without declaratory and injunctive relief, Plaintiff will be irreparably harmed.

## COUNT II

### Violation of the First Amendment to the U.S. Constitution

### (Right to Assemble)

85. Plaintiffs incorporate by reference paragraphs 1 through 73.

86. The First Amendment prohibits Defendants from violating Plaintiff's right to peaceably assemble.

87. The Governor's Church Gathering Ban violates Plaintiff's right to peaceably assemble because the ban on in-person services does not serve any legitimate, rational, substantial, or compelling governmental interest, especially when viewed in light of the numerous secular activities exempted under the Governor's orders.

88. Defendants have alternative, less restrictive means to achieve any interest that it might have.

89. The Church Gathering Ban violates the right to assemble under the First Amendment to the United States Constitution, both facially and as applied.

90. Without declaratory and injunctive relief, Plaintiff will be irreparably harmed.

## COUNT III

### Violation of the First Amendment to the U.S. Constitution

### (Free Speech)

91. Plaintiffs incorporate by reference paragraphs 1 through 73.

92. The Governor's Church Gathering Ban violates Plaintiff's freedom of speech by prohibiting it from engaging in religious speech through its church services, which occur exclusively on private property.

93. The Governor's Church Gathering Ban specifically targets meetings of more than 50 people for the purpose of religious expression, while permitting meetings of the same or greater size for secular purposes.

94. The Governor's Church Gathering Ban is thus is content- and viewpoint-based in violation of the First Amendment.

95. The Governor's Church Gathering Ban gives government officials unbridled discretion with respect to enforcement of the order and the imposition of any penalty, making the order susceptible to both content- and viewpoint-based discrimination.

96. Prohibiting or punishing Plaintiff's religious speech does not serve any legitimate, rational, substantial, or compelling governmental interest.

97. The State also has alternative, less restrictive means to achieve any interest that it might have.

98. The Church Gathering Ban violates the Free Speech Clause of the First Amendment to the United States Constitution, both facially and as applied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants from enforcing those portions of the Governor's orders that limit in-person church services to 50 or fewer persons, thereby allowing Plaintiff and its congregants to resume corporate prayer and worship while following adequate social distancing and public health guidelines.

b. Enter a judgment declaring that those portions of the Governor's orders that limit in-person church services to 50 or fewer persons violate the U.S. Constitution's Free Exercise and Right to Assemble Clauses, both facially and as-applied;

  c. Award Plaintiff court costs and reasonable attorney's fees; and

  d. Award such other and further relief as to which Plaintiff may be entitled.

Respectfully submitted this 28th day of May 2020.

<div style="display:flex">

Kristen K. Waggoner (AZ Bar 032382)*
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application forthcoming

</div>

s/ Jason D. Guinasso
Jason D. Guinasso (SBN# 8478)
500 Damonte Ranch Pkwy, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
jguinasso@hutchlegal.com

18

**VERIFICATION**

I declare under penalty of perjury that the foregoing Verified Complaint has been examined by me and that the factual allegations therein are true to the best of my knowledge, information, and belief.

Dated: May 28, 2020

_____
Pastor Garry Leist
Calvary Chapel Dayton Valley