Jason D. Guinasso (SBN# 8478)
500 Damonte Ranch Pkwy, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
jguinasso@hutchlegal.com

Kristen K. Waggoner (AZ Bar 032382)*
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application forthcoming

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY, <br><br> *Plaintiff*, <br><br> v. <br><br> STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as Attorney General of Nevada; FRANK HUNEWILL, in his official capacity as Sheriff of Lyon County, <br><br> *Defendants*. | Case No.: 3:20-cv-00303-LRH-CLB <br><br><br> **PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> ORAL ARGUMENT REQUESTED |

***EMERGENCY MOTION***

Pursuant to Fed. R. Civ. P. 65 and LR 7-4, Plaintiff Calvary Chapel Dayton Valley, hereby moves the Court for a temporary restraining order and preliminary injunction, and permanent injunction prohibiting Defendants from enforcing those portions of the Governor's orders that limit in-person church services to 50 or fewer persons, thereby allowing Plaintiff and its congregants to resume corporate prayer and worship while following adequate social distancing and public health guidelines.

In support of this motion, Plaintiff relies upon the attached memorandum of points and authorities, the Declaration of Garry D. Leist, and the Declaration of Jason D. Guinasso Pursuant to Local Rule 7-4. A proposed order is attached. Oral argument is respectfully requested.

Respectfully submitted this 28th day of May 2020.

Kristen K. Waggoner (AZ Bar 032382)*
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application forthcoming

s/ Jason D. Guinasso
Jason D. Guinasso (SBN# 8478)
500 Damonte Ranch Pkwy, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
jguinasso@hutchlegal.com

Jason D. Guinasso (SBN# 8478)
500 Damonte Ranch Pkwy, Suite 980
Reno, NV 89521
Telephone: (775) 853-8746
jguinasso@hutchlegal.com

Kristen K. Waggoner (AZ Bar 032382)*
Ryan J. Tucker (AZ Bar 034382)*
Jeremiah Galus (AZ Bar 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
kwaggoner@adflegal.org
rtucker@adflegal.org
jgalus@adflegal.org

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application pending

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY, | Case No.: 3:20-cv-00303-LRH-CLB |
| *Plaintiff*, | |
| v. | |
| STEVE SISOLAK, in his official capacity as Governor of Nevada; AARON FORD, in his official capacity as Attorney General of Nevada; FRANK HUNEWILL, in his official capacity as Sheriff of Lyon County, | **MEMORANDUM OF POINTS AND AUTHORTIIES IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| *Defendants*. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ...................................................................................... 1

BACKGROUND ....................................................................................... 2

    A.    Calvary Chapel Dayton Valley ........................................... 2

    B.    The Church's Plan to Resume In-Person Services ........................... 2

    C.    Governor Sisolak's Orders ............................................... 5

LEGAL STANDARD ................................................................................. 9

ARGUMENT ........................................................................................... 9

I.    The Church is likely to succeed on the merits of its claims. ...................... 9

    A.    The Church Gathering Ban violates the Free Exercise Clause. ................................................................. 9

        1.    The Ban triggers strict scrutiny because it is not generally applicable. ............................................ 10

        2.    The Ban also triggers strict scrutiny because it is not neutral. .............................................................. 13

        3.    The Ban triggers strict scrutiny because it involves a system of individual exemptions. ............................... 15

    B.    The Church Gathering Ban violates the Church's free speech and assembly rights. ........................................ 16

    C.    The Church Gathering Ban fails strict scrutiny. ........................... 17

II.    Covid-19 does not justify banning the Church's services while allowing larger secular gatherings. ......................................... 19

III.    The Church has already suffered and will continue to suffer irreparable harm without an injunction. ....................................... 21

IV.    The balance of equities sharply favors the Church. ........................... 21

V.    An injunction would serve the public interest. ............................... 21

CONCLUSION ....................................................................................... 22

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Berean Baptist Church v. Cooper,*
No. 4:20-CV-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020) .................... 14

*Brown v. Entertainment Merchandisers Ass'n,*
564 U.S. 786 (2011) ..................................................................................... 17

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ..................................................................................... 17

*Calvary Chapel of Bangor v. Mills,*
No. 1:20-cv-00156, 2020 WL 2310913 (D. Me. May 9, 2020) .......................... 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .............................................................................*passim*

*Contractors Ass'n of Eastern Pa. v. City of Philadelphia,*
6 F.3d 990 (3d Cir. 1993) ............................................................................. 17

*Cross Culture Christian Center v. Newsom,*
No. 2:20-cv-00832, 2020 WL 2121111 (E.D. Cal. May 5, 2020) ...................... 12

*Elrod v. Burns,*
427 U.S. 347 (1976) ..................................................................................... 21

*Employment Division, Department of Human Resources of Or. v. Smith,*
494 U.S. 872 (1990) ................................................................................ 15, 16

*First Baptist Church v. Kelly,*
No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) ................ 18–19

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
170 F.3d 359 (3d Cir. 1999) ......................................................................... 12

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006) ..................................................................................... 17

*Guru Nanak Sikh Society of Yuba City v. County of Sutter,*
456 F.3d 978 (9th Cir. 2006) ........................................................................ 16

*In re Abbott,*
2020 WL 1685929 (5th Cir. Apr. 7, 2020) ..................................................... 19

*Jacobson v. Commonwealth of Mass.,*
197 U.S. 11 (1905) ....................................................................................... 20

*Koller v. Brown,*
    224 F. Supp. 3d 871 (N.D. Cal. 2016)................................................................ 9

*Lovell v. City of Griffin,*
    303 U.S. 444 (1938) ...................................................................................... 16

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) .................................................................................. 13

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .................................................................... 9, 21

*Midrash Sephardi, Inc. v. Town of Surfside,*
    366 F.3d 1214 (11th Cir. 2004) .................................................................... 12

*Quiroga v. Chen,*
    735 F. Supp. 2d 1226 (D. Nev. 2010) ............................................................ 9

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...................................................................................... 16

*Roberts v. Neace,*
    958 F.3d 409 (6th Cir. 2020) ...............................................................*passim*

*Sanders County Republican Cent. Comm. v. Bullock,*
    698 F.3d 741 (9th Cir. 2012) ........................................................................ 17

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ...................................................................................... 15

*South Oregon Barter Fair v. Jackson County, Or.,*
    372 F.3d 1128 (9th Cir. 2004) ...................................................................... 17

*Susan B. Anthony List v. Driehaus,*
    814 F.3d 466 (6th Cir. 2016) ........................................................................ 17

*United States v. Chalk,*
    441 F.2d 1277 (4th Cir. 1971) ...................................................................... 19

*Widmar v. Vincent,*
    454 U.S. 263 (1981) ...................................................................................... 16

*Winter v. Natural Resource Defense Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................ 9

**INTRODUCTION**

This action challenges Governor Steve Sisolak's emergency orders prohibiting churches and other places of worship from holding in-person worship services of more than 50 people, even when such services could be held in accordance with social distancing and public health guidelines (the "Church Gathering Ban").

For over two months, Covid-19 and the Governor's Orders have prevented Plaintiff Calvary Chapel Dayton Valley (the "Church") from holding in-person worship services. The Church has patiently waited for Governor Sisolak to restore its First Amendment freedoms, trusting that the Governor would prioritize constitutional rights and allow churches to resume in-person worship services at the earliest opportunity. But that trust has been shattered.

Rather than prioritize religious freedom, the Governor has moved "non-essential" secular businesses and activities to the front of the line and pushed churches towards the back. Currently, in-person worship services of more than 50 people are banned across the state. But no such restriction applies to a host of similarly situated secular businesses and gatherings, including movie theaters, restaurants, bars, bowling alleys, amusement parks, indoor shopping malls, gyms, fitness facilities, museums, art galleries, swimming pools, water parks, aquariums, and casinos, to name just a few.

There is no good reason—let alone a constitutional one—for this disparate treatment. Thus, the Church seeks to resume in-person worship services on Sunday, May 31, and has adopted strict social distancing and hygiene protocols to govern those services. Despite these health and safety measures, however, the Church Gathering Ban threatens the Church with criminal and civil penalties. A temporary restraining order and injunction are needed to preserve the Church's constitutional rights and allow it to resume worship services consistent with its religious beliefs.

# BACKGROUND

## A.      Calvary Chapel Dayton Valley

Calvary Chapel Dayton Valley ("CCDV" or the "Church) has been serving its community since 2006. First Am. Compl. ("FAC") ¶ 20; Leist Decl. ¶¶ 2, 14–15. As a Christian church, the Church believes that the Bible is the inspired Word of God and sole authority for faith and practice; it is the foundation upon which the Church operates and the basis on which it is governed. Leist Decl. ¶ 4. Among other things, the Church believes that the Bible commands Christians to gather in-person for corporate prayer, worship, and fellowship and that such assembly is necessary and good for the Church and its members' spiritual growth. *Id.* ¶¶ 5, 7–13; *accord* Hebrews 10:24–25 (ESV) ("And let us consider how to stir up one another to love and good works, not neglecting to meet together, as is the habit of some, but encouraging one another, and all the more as you see the Day drawing near). The gathering of the "ekklesia"—the New Testament term for "assembly" or "called out"—is central to the Church's faith in Jesus Christ. Leist Decl. ¶ 7. Indeed, the Church believes that such assembly is "the embodiment of Christ on earth" and how believers "best express His image and likeness." *Id.* ¶ 10. This "sacred assembly" cannot simply be substituted with virtual or "drive-in" services. *Id.*

## B.      The Church's Plan to Resume In-Person Services

In response to federal, state, and local guidance at the beginning of the Covid-19 outbreak—but before any local or state order prohibited in-person gatherings—the Church voluntarily adopted rigorous social distancing and health safety measures for its worship services. *Id.* ¶ 17.

Right after Governor Sisolak declared a state of emergency on March 12, the Church took proactive steps for its upcoming March 15 services. *Id.* ¶ 18. The Church disinfected common surfaces such as door handles, chairs, and tables before

and after services; made hand sanitizer available in multiple locations throughout common areas; advised attendees to refrain from personal contact such as handshakes and hugs; and instructed those who felt sick or lived with someone who felt sick to stay home. *Id.* The next day, on March 16, 2020, the Church temporarily suspended in-person worship services and began streaming its services online. *Id.* ¶ 19.

More than two months later, and as a direct result of the Governor's orders, the Church has been prohibited from resuming in-person worship services. *Id.* ¶ 20. Consistent with its religious beliefs about corporate prayer, worship, and fellowship, the Church believes that it is called to resume in-person services. *Id.* ¶ 21. Not only have some parishioners been unable to participate in online services, but the Church believes that neither virtual nor drive-in services satisfy the biblical requirement that the Church meet in person for corporate worship. *Id.* ¶ 8.

Before Covid-19, the Church held two Sunday services with about 200 persons at each service. To ensure the health and safety of its staff and attendees, the Church plans to hold in-person services up to 50% of its sanctuary's capacity while also providing for proper social distancing of at least six feet separation between families and individuals. *Id.* ¶¶ 30–31. That amounts to about 90 people per service. *Id.* ¶ 31.

The Church also has adopted—and will follow—strict social distancing and health and safety protocols. These include:

- Holding services only on Sunday and Wednesday;
- Limiting Sunday services to 45 minutes (as opposed to the usual 90 minutes);
- Holding up to three services each Sunday to guarantee adequate space for social distancing at each service;

3

- Providing ½ hour between services to allow for thorough cleaning and sanitizing of the sanctuary, hallways, bathrooms, and common surfaces;
- Posting signs on walls and floors to direct traffic;
- Posting signs on restroom doors limiting use to one person at a time;
- Posting signs in the restrooms encouraging proper washing of hands;
- Making hand sanitizer stations easily accessible to attendees;
- Encouraging attendees to arrive no earlier than 25 minutes before service;
- Using parking attendants to direct cars to designated parking areas;
- Directing all attendees to a designated entrance;
- Directing attendees to sanctuary seating designed to provide six feet of separation between families and individuals;
- Ensuring that all traffic for each service will be in one direction by using "first in, last out" model;
- Advising attendees of proper social distancing protocols;
- Encouraging attendees to bring and wear face coverings;
- Requiring all servants greeting or directing attendees to wear face coverings;
- Prohibiting any handouts or items to be passed to attendees during services;
- Prohibiting snacks or coffee from being served;
- Using prepacked Communion elements whenever served;
- Directing attendees out of the building to the parking area at the end of each service; and
- Instructing attendees to refrain from congregating in the building.

*Id.* ¶ 32.

4

### C.    Governor Sisolak's Orders

On March 12, 2020, Governor Sisolak declared a state of emergency in response to the Covid-19 outbreak. *See* Declaration of Emergency (FAC, Ex. 3). Noting that the Nevada Constitution gives him "[t]he supreme executive power of this State," Governor Sisolak "direct[ed] all state agencies to supplement the efforts of all impacted and threatened counties" and further announced that he would "perform and exercise such other functions, powers, and duties as are necessary to promote and secure the safety and protection of the civilian population." *Id.*

Five days later, Governor Sisolak held a press conference and explained actions the State would be taking to mitigate the risks associated with Covid-19. *See* Press Release, Mar. 17, 2020 (FAC, Ex. 4). Notably, Governor Sisolak assured "faith leaders" that he "cannot and will not say that places of worship should be closed." *Id.* at 4. That promise, however, proved to be short lived.

***"Essential" and "Non-Essential Businesses.*** Shortly after holding his press conference, Governor Sisolak issued an order mandating the closure of all "Non-Essential Businesses." *See* Directive 003 (FAC, Ex. 5). That order defined "Non-Essential Businesses" to include, among other things, businesses that "promote recreational social gathering activities" and businesses that "promote extended periods of public interaction where the risk of [Covid-19] transmission is high," such as "beauty shops, barber shops, [and] nail salons." *Id.*, §§ 1, 2. The order therefore also limited restaurants and food establishments to "take-out, drive-through, curbside pickup, [and] delivery" service and prohibited them from providing dine-in service to any customers. *Id.*, § 3.

The Governor's order did not close "Essential Licensed Business[es]" but encouraged them "to continue operation." *Id.*, § 4. In connection with that order, the State adopted emergency regulations further defining "essential" and "non-

essential" businesses. *See* Emergency Regulations, March 20, 2020 (FAC, Ex. 6). Businesses not delineated in the Governor's order or in the emergency regulations could continue operations if they could "implement social distancing safeguards for the protection of their employees" and, "[t]o the extent practicable, provide services without causing members of the Nevada general public to congregate in a manner contrary to social distancing goals of a minimum of six feet of separation for more than incidental contact." Directive 003, § 8 (FAC, Ex. 5).

Because neither the Governor's order about "essential" and "non-essential" businesses nor the emergency regulations referenced churches or places of worship, they should have been allowed to continue operations and in-person services.

**The Church Gathering Ban.** A few days later, Governor Sisolak issued another order—this time forbidding the "general public" from "gather[ing] in groups of ten or more in any indoor or outdoor area." Directive 007, § 1 (FAC, Ex. 7). And even though the Governor had assured faith leaders that he would not shut down their services, he later prohibited "[p]laces of worship" from "hold[ing] in-person worship services where ten or more persons may gather." Directive 013, § 4 (FAC, Ex. 9). The Governor's office then issued "guidance" claiming "this is not yet the time to get people together to celebrate their faith" and that "nobody should be physically attending in-person worship services." Guidance: Directive 013, Apr. 8, 2020 (FAC, Ex. 10). Governor Sisolak continued to impose this ten-person restriction on churches during Phase 1 of the state's reopening plan. FAC ¶ 54.

On May 26, 2020, Governor Sisolak announced that Nevada would be moving into Phase 2 of the state's reopening plan on Friday, May 29. FAC ¶ 55. Although the Governor announced that even more "non-essential" businesses and activities will be allowed in Phase 2, in-person worship services will be restricted to 50 people. FAC ¶ 56. The Church Gathering Ban is indefinite.

***Secular Exceptions to the Gathering Restrictions.*** There are many secular exceptions to the Governor's gathering restrictions. For one thing, the restrictions do not apply to "the gathering of persons . . . working at or patronizing Essential Licensed Businesses or providing essential services to the public." Directive 007, § 1 (FAC, Ex. 7). Thus, at least 28 categories of businesses have been exempted all along from the Governor's gathering restrictions. This includes, for example:

- "Essential infrastructure operations," including "airport[s]";
- "Businesses that ship or deliver goods directly to residences";
- "Banks and Financial Institutions";
- "Pawnbrokers";
- Businesses or entities that provide "social services for economically disadvantaged individuals, vulnerable populations, or victims of crime";
- "Laundromats and dry cleaners";
- "Warehouses and storage facilities";
- "Professional or technical services including legal, accounting, tax, payroll, real estate, and property management services";
- "Child care facilities"; and
- "Newspapers, television, radio, and other media services."

*See* NAC 414.XXX(1) (FAC, Ex. 6).

Moreover, Governor Sisolak's "Phase One" order exempted certain "non-essential" businesses and activities and allowed:

- All restaurants and food establishments to resume onsite, in-person dining—up to "50% of the maximum seating capacity under normal circumstances";

- All retail businesses to reopen at 50% capacity;
- Auto showrooms, furniture showrooms, home furnishing showrooms, and appliance showrooms to reopen at 50% capacity;
- Cannabis dispensaries to resume in-person sales; and
- Nail care salons, hair salons, and barber shops to reopen.

Directive 018, §§ 13, 15, 16, 17, 22 (FAC, Ex. 12).

And just this week, the Governor exempted even more "non-essential" businesses and activities as part of Phase 2, allowing the following to now reopen:

- Gyms and fitness facilities, including group fitness classes, up to 50% building capacity;
- Bars and taverns, up to 50% capacity;
- Salons and other businesses that provide aesthetic or skin services, including facials, hair removal, tanning, eyelash services, eyebrow threading, and salt therapy;
- Day and overnight spas;
- Massage services;
- Body art and piercing establishments;
- Aquatic facilities and swimming pools, up to 50% capacity;
- Water parks, up to 50% capacity;
- Museums, art galleries, zoos, and aquariums, up to 50% capacity;
- Outdoor venues, like mini golf and amusement parks;
- Indoor venues, like movie theaters, bowling alleys, and indoor malls, up to 50% capacity; and
- Casinos (starting June 4).

**LEGAL STANDARD**

The same standard applies to requests for preliminary injunctions and requests for temporary restraining orders. *Quiroga v. Chen*, 735 F. Supp. 2d 1226, 1228 (D. Nev. 2010). To obtain a preliminary injunction or restraining order, the plaintiff must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012).

To satisfy the "likelihood of success" element, the Church does not have to "prove his case in full" or show that it is "more likely than not to prevail." *Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016) (internal citation and quotations omitted). Rather, the Church must show only that it has a "fair chance of success on the merits" or raises questions "serious enough to require litigation." *Id.* (internal quotations omitted).

**ARGUMENT**

**I.      The Church is likely to succeed on the merits of its claims.**

This Court should grant the Church's motion because it is likely to succeed on the merits of one or more of its claims.

**A.      The Church Gathering Ban violates the Free Exercise Clause.**

The Free Exercise Clause protects the Church's right to gather for religious worship and the Church Gathering Ban restricts that right. Strict scrutiny therefore applies because the Ban is neither neutral nor generally applicable and because it involves a system of "individualized government assessments." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993).

9

### 1. The Ban triggers strict scrutiny because it is not generally applicable.

Under the Free Exercise Clause, a law or rule that is not generally applicable is subject to strict scrutiny. *Id.* at 531. A law is not generally applicable if it "fail[s] to prohibit nonreligious conduct that endangers" the government's interest "in a similar or greater degree" than the prohibited religious conduct. *Id.* at 542.

Here, the State is not pursuing its purported interest evenhandedly, favoring secular businesses and activities over religious services. Indeed, the Governor has artificially capped church services at 50 people but allowed:

- Movie theaters, bowling alleys, and indoor malls to reopen at 50% capacity;

- Museums, art galleries, zoos, and aquarium to reopen at 50% capacity;

- Restaurants and food establishments to resume onsite, in-person dining at 50% capacity;

- Bars and taverns to reopen at 50% capacity;

- Non-essential retail businesses to reopen at 50% capacity;

- Gyms and fitness facilities, including group fitness classes, to reopen at 50% capacity;

- Aquatic facilities and pools to reopen at 50% capacity;

- Massage services to resume;

- Nail care salons, hair salons, and barber shops to reopen; and

- Casinos to reopen June 4.

Directive 018, §§ 13, 15, 16, 17, 22 (FAC, Ex. 12); Press Release, May 26, 2020 (FAC, Ex. 13).

These exemptions are constitutionally significant. Indeed, the Governor has exempted from his gathering restrictions businesses and activities that prior orders

have determined "promote extended periods of public interaction where the risk of [Covid-19] transmission is high." Directive 003, § 2 (FAC, Ex. 5).

What is more, these exemptions from the State's gathering restrictions are *in addition to* 28 other categories of previously exempted activities and businesses. Even before the Governor exempted the "non-essential" businesses and activities identified above, the State's gathering restrictions—including both the earlier 10-person limit and current 50-person limit—did not apply to "the gatherings of persons . . . working at or patronizing Essential Licensed Businesses or providing essential services to the public." Directive 007, § 1 (FAC, Ex. 7). That means an unlimited number of people can assemble for an unlimited period of time to, among other things, work at or patronize: "essential infrastructure operations," including "airports"; "businesses that ship or deliver goods directly to residences"; "banks and financial institutions"; "pawnbrokers"; businesses or entities that provide "social services for economically disadvantaged individuals, vulnerable populations, or victims of crime"; "laundromats and dry cleaners"; "warehouses and storage facilities"; "professional or technical services including legal, accounting, tax, payroll, real estate, and property management services; "child care facilities"; and "newspapers, television, radio, and other media services." NAC 414.XXX(1) (FAC, Ex. 6).

Given these exemptions, the Church Gathering Ban cannot reasonably be said to be "generally applicable." Indeed, the Sixth Circuit recently recognized as much in *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), where it held that the Kentucky Governor's restrictions on in-person worship services likely violated the Free Exercise Clause because there were "serial exemptions for secular activities [that] pose comparable public health risks."

So too here. In fact, even those courts that have upheld restrictions on in-person worship services during the Covid-19 outbreak have explained that the analysis and outcome would be different if the governors there did what the Nevada Governor has done here. *See, e.g.*, *Calvary Chapel of Bangor v. Mills*, No. 1:20-cv-00156, 2020 WL 2310913, at *8 (D. Me. May 9, 2020) (holding that Governor's Covid-19 orders were generally applicable because certain entities, including "restaurants" and "movie theaters," faced "the same restrictions as the [church]"); *Cross Culture Christian Ctr. v. Newsom*, No. 2:20-cv-00832, 2020 WL 2121111, at *6 (E.D. Cal. May 5, 2020) (stating that a "restaurant" or "movie" is "[a] more apt comparison" to an in-person church service, where "a large group of individuals come together at the same time in the same place for the same purpose").

Because the many secular exemptions from the State's gathering restrictions undermine the government's purported interest in slowing or preventing the spread of Covid-19, the Governor's orders are not generally applicable. The Church Gathering Ban therefore triggers strict scrutiny. *Lukumi*, 508 U.S. at 543–44; *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234–35 (11th Cir. 2004) (exempting clubs and lodges, but not houses of worship, "violates the principles of neutrality and general applicability because private clubs and lodges endanger [the town's] interest in retail synergy as much or more than churches and synagogues"); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) ("[W]hen the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.")

### 2. The Ban also triggers strict scrutiny because it is not neutral.

The Church Gathering Ban triggers strict scrutiny for another independent reason: it is not neutral. *See Lukumi*, 508 U.S. at 531.

For one thing, the Church Gathering Ban is not even facially neutral. The Governor specifically calls out religious gatherings, prohibiting places of worship from holding in-person services of more than 50 people and accusing churches of being "hotspots for COVID-19 transmission." Press Release, May 26, 2020 (FAC, Ex. 13).

Moreover, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 534). The Supreme Court has explained that a law or rule is not neutral if it singles out religious conduct for adverse treatment; visits "gratuitous restrictions on religious conduct"; creates a "religious gerrymander" that in practical effect singles out religious practices for worse treatment; *or* treats the same conduct as lawful when performed for secular reasons but unlawful when performed for religious reasons. *Lukumi*, 508 U.S. at 533–35; *accord Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) ("Faith-based discrimination can come in many forms," including in laws or rules that "might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities"). The Supreme Court's free-exercise jurisprudence therefore demands that this Court "survey meticulously," *Lukumi*, 508 U.S. at 534, the risks and character of the businesses and activities that the State continues to allow.

Here, the Church Gathering Ban places an artificial numerical cap on religious services rather than allow houses of worship to hold services in accordance

with social-distancing and safety guidelines, as the State allows for many secular businesses and activities. The Church has voluntarily adopted procedures more than adequate to this end. *See* FAC ¶¶ 35–36. While the State has imposed a strict numerical limit on the Church's religious services, there is no such limitation for the secular businesses and activities detailed above.

In other words, with the Church Gathering Ban, the State has targeted the Church for unfair treatment while allowing great latitude for preferred secular businesses and activities. This includes even "non-essential" businesses and activities that the State determined "promote extended periods of public interaction where the risk of [Covid-19] transmission is high." Directive 003, § 2 (FAC, Ex. 5). Remarkably, the State trusts its residents to socially distance and follow general health and safety guidelines while gathering on a *daily* basis for similar secular activities, but it does not trust them to do so once or twice a week if they are assembling for religious purposes. This is unconstitutional. *See Lukumi*, 508 U.S. at 547 (strict scrutiny applies "even upon slight suspicion" that "state intervention" stems from "distrust of [religious] practices"); *accord Berean Baptist Church v. Cooper*, No. 4:20-CV-81-D, 2020 WL 2514313, at *9 (E.D.N.C. May 16, 2020) (applying strict scrutiny to Governor's restrictions on in-person church services because exceptions for other activities "reveals that the Governor appears to trust citizens to perform non-religious activities indoors (such as shopping or working or selling merchandise) but does not trust them to do the same when they worship indoors together").

### 3. The Ban triggers strict scrutiny because it involves a system of individual exemptions.

The Church Gathering Ban also triggers strict scrutiny because it involves "a system of individual exemptions." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990).

In *Smith*, the Supreme Court held that laws burdening religious exercise must survive strict scrutiny if they are not "neutral" towards religion or "of general applicability." *Id.* at 879. Applying that test, the Court held that the Free Exercise Clause did not prohibit the government from denying unemployment benefits to a worker fired for using illegal drugs, even if the drugs were used for religious reasons. *Id.* at 890. In so doing, the Court was careful to distinguish neutral, generally applicable drug laws from laws allowing a government official to make an "individualized … assessment of the reasons for the relevant conduct." *Id.* at 882–84 (citing cases).

In explaining this distinction, the Court discussed *Sherbert v. Verner*, 374 U.S. 398 (1963), which involved an unemployment compensation law that allowed the government to deny unemployment benefits if the person refused work "without good cause." *Smith*, 494 U.S. at 884. The Court explained that strict scrutiny applied in *Sherbert* because the law's "good cause" inquiry "created a mechanism for individualized exemptions" depending on a government official's discretion. *Id.* at 884–85. It then held that, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.* at 884.

This case falls within the "individualized assessments" exception to *Smith*. By declaring a state of emergency, the Governor has given himself unbridled discretion to grant individualized exemptions from any of his orders, including

gathering restrictions. And the Governor has exercised that discretion. He has excused a wide-array of both "essential" and "non-essential" businesses from the State's prohibition of gatherings of 50 or more people, while refusing to extend a similar accommodation to the Church's services.

Because the Governor's exercise of power has resulted in a system of "individual exemptions," he cannot now "refuse to extend that system to cases of 'religious hardship'" without surviving strict scrutiny. *Smith*, 494 U.S. at 884; *accord Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 993 (9th Cir. 2006) ("When such regulations involving individualized assessments impose substantial burdens on religious exercise, they are subject to strict scrutiny to protect and vindicate the right of free exercise of religion from governmental encroachment.").

**B.     The Church Gathering Ban violates the Church's free speech and assembly rights.**

Religious speech is protected under the First Amendment. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *Lovell v. City of Griffin,* 303 U.S. 444 (1938). And the government may not restrict private speech on private property, religious or otherwise, without satisfying strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (town's sign ordinance restricting speech "on private property or on a public right of way" subject to strict scrutiny).

Here, the State has banned the Church from holding worship services on its own property. Because the Church's services consist entirely of protected expression and speech, such as praise and worship, participation in biblical ordinances and rites, and religious preaching and teaching, the Church Gathering Ban restricts speech and triggers strict scrutiny.

In addition, the Governor's orders restrict religious expression but do not impose a similar restriction on secular expressive activities performed at museums, movie theaters, art galleries, and fitness classes. *See S. Oregon Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128 (9th Cir. 2004) ("religious ceremonies" are "expressive"). Such a content- and viewpoint-based restriction likewise triggers strict scrutiny. *See Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 746 (9th Cir. 2012) (content-based restriction triggers strict scrutiny).

As explained below, the Defendants cannot satisfy that rigorous standard.

## C.  The Church Gathering Ban fails strict scrutiny.

Because strict scrutiny applies, Defendants must prove that banning the Church's in-person services "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546. Defendants cannot satisfy this "highest level of review." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016).

While enacting safety measures to curb the spread of Covid-19 may generally be considered a compelling interest, this Court must still "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726–27 (2014). Even "plausible hypotheses are not enough to satisfy strict scrutiny," *Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 1008 (3d Cir. 1993), and "ambiguous proof will not suffice," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 800 (2011). Thus, "broadly formulated" statewide interests and generalized descriptions of health risks, like those referenced by the Governor here, are not compelling. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). And "a law cannot be regarded as protecting an interest 'of the highest order' when it leaves

appreciable damage to that supposedly vital interest unprohibited," *Lukumi*, 508 U.S. at 547 (internal markings omitted), as the many secular exemptions do here.

What is more, Defendants must establish that the Church Gathering Ban is the "least restrictive means" of furthering any compelling interest that they might have—a burden that they cannot possibly carry for three independent reasons.

First, Defendants cannot show that it is necessary to subject the entire state to its restrictions. Indeed, CDC guidance for faith-based organizations recommends a graduated approach based on community risk.[1] And such approach must be equally applied to secular gatherings. But the wisdom (and practicality) of such an individually tailored, less-restrictive means is completely missing from the Governor's blanket, statewide approach.

Second, and as detailed above, the Governor has exempted numerous secular activities and facilities from the gathering restriction currently placed on houses of worship. Although the Church Gathering Ban identifies places of worship for increased regulation, indoor gatherings that invite similar or greater interpersonal interaction—such as gatherings at casinos, movie theaters, museums, restaurants, bars and taverns, gyms, fitness centers, retail establishments, professional office environments, nail salons, barbers, hair salons, and amusement parks (to name just a few)—are left unregulated, except by the less-restrictive means of general social distancing and hygiene guidelines. *See Lukumi*, 508 U.S. at 536–38 (concluding that when the same conduct "in almost all other circumstances [goes] unpunished," religious conduct has been unconstitutionally "singled out for discriminatory treatment"); *accord First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL

---

[1] *See, e.g.*, Center For Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html (last visited May 27, 2020).

1910021 (D. Kan. Apr. 18, 2020) ("Plaintiffs can likely show that the broad prohibition against in-person religious services of more than ten congregants is not narrowly tailored to achieve the stated public health goals where the comparable secular gatherings are subjected to much less restrictive conditions.").

Finally, the Governor has offered *no* justification for why compliance with social-distancing and hygiene requirements on the part of churches would not satisfy the government's public health interest. Indeed, the continued reliance on social-distancing and hygiene restrictions for similar secular activities proves that the additional restrictions and burdens placed on religious services are not the least-restrictive way to satisfy the State's purported interest. The State simply cannot justify allowing movie theaters, restaurants, bars, gyms, fitness centers, water parks, retail establishments, and other secular businesses to operate at 50% or greater capacity (for upwards of eight hours per day, seven days a week) while criminalizing every in-person church service (no matter how short or infrequent) just because it involves more than 50 people. *See Roberts*, 958 F.3d 409 (6th Cir. 2020) ("How can the same person be trusted to comply with social-distancing and other health guidelines in secular settings but not be trusted to do the same in religious settings? The distinction defies explanation.").

## II.   Covid-19 does not justify banning the Church's services while allowing larger secular gatherings.

Defendants may argue that Covid-19 poses a unique circumstance that removes the Church Gathering Ban from a traditional constitutional analysis. But the government's exercise of emergency powers "is not conclusive or free from judicial review." *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971). And the "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020). These

individual rights are always in force and restrain government action. Thus, "[a] local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict . . . with any right which [the U.S. Constitution] gives or secures." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 25 (1905).

Indeed, the Supreme Court has instructed courts to intervene in situations precisely like this one—where the law at issue "has no real or substantial relation to [public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31.

Here, the Church Gathering Ban cites no authority that merely being present in a church building with more than 50 people poses a unique and unacceptable threat to public health and safety. And the Governor has pointed to no scientific, public health, or other authority that explains why religious services or activities pose a special health risk in a way that other exempt secular activities and facilities do not. The Church Gathering Ban does not allow the Church to hold its services while following social distancing and health and safety protocols. Without explanation, however, the Governor has allowed many similarly situated businesses to open to unlimited numbers people so long as social distancing protocol is followed.

Such disparate treatment cannot survive under *Jacobson*. In fact, the Sixth Circuit recently cited *Jacobson* in temporarily enjoining similar restrictions on in-person church services, explaining that "restrictions inexplicably applied to one group and exempted from another do little further" the government's goal of slowing the spread of the virus. *Roberts*, 958 F.3d 409 (6th Cir. 2020). After all, if the same precautions are taken, "why can someone safely [sit in a restaurant or movie theater] but not a pew? And why can someone safely interact with a brave

[waitress, barber, or nail technician] but not with a stoic minister?" *Id.* Like the government in *Roberts*, the Defendants here "have no good answers." *Id.*

### III.   The Church has already suffered and will continue to suffer irreparable harm without an injunction.

The Supreme Court recognizes that "the deprivation of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As detailed above, the Church Gathering Ban violates the Church's constitutional rights and will continue to violate its rights without immediate relief.

### IV.   The balance of equities sharply favors the Church.

The equities favor the Church because the law places a premium on protecting constitutional rights. The Church Gathering Ban irreparably harms the Church's constitutional rights and significantly hinders its ministry to its parishioners and community. Meanwhile, an injunction need not harm Defendants at all. Local health officials can subject infected persons to orders of isolation and quarantine. And the State remains free to adopt permissible and reasonable regulations for in-person worship services, including narrowly tailored social distancing and health and safety measures, in a similar fashion as it has done with secular activities. But a flat ban on services involving more than 50 people—regardless of the protective measures in place—serves no governmental interest and is not narrowly tailored.

### V.   An injunction would serve the public interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. This is particularly true for First Amendment freedoms. Because the requested injunction will accomplish this, the public interest also favors an order protecting the Church.

## CONCLUSION

For these reasons, Plaintiff Calvary Chapel Dayton Valley respectfully requests that this Court grant this motion and allow the Church to resume in-person worship services, in compliance with appropriate social distancing and health guidelines, by this Sunday, May 31.

Respectfully submitted this 28th day of May 2020.

|  |  |
|---|---|
| | s/ Jason D. Guinasso |
| Kristen K. Waggoner (AZ Bar 032382)* | Jason D. Guinasso (SBN# 8478) |
| Ryan J. Tucker (AZ Bar 034382)* | 500 Damonte Ranch Pkwy, Suite 980 |
| Jeremiah Galus (AZ Bar 030469)* | Reno, NV 89521 |
| ALLIANCE DEFENDING FREEDOM | Telephone: (775) 853-8746 |
| 15100 N. 90th Street | jguinasso@hutchlegal.com |
| Scottsdale, AZ  85260 | |
| Telephone: (480) 444-0020 | |
| kwaggoner@adflegal.org | |
| rtucker@adflegal.org | |
| jgalus@adflegal.org | |

David A. Cortman (GA Bar 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application pending