AARON D. FORD
  Attorney General
CRAIG A. NEWBY (Bar No. 8591)
  Deputy Solicitor General
State of Nevada
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100 (phone)
(775) 684-1108 (fax)
Email: CNewby@ag.nv.gov

*Attorneys for Steven Sisolak, Governor,*
*and Aaron Ford, Attorney General*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY<br><br>        Plaintiff,<br><br> vs.<br><br>STEVE SISOLAK, in his official capacity<br>as Governor of Nevada, et al.,<br><br>        Defendants. | Case No. 3:20-cv-00303-LRH-CLB |

## OPPOSITION TO PLAINTIFFS' EMERGENCY
## MOTION FOR PRELIMINARY INJUCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ................................................................................................2

II.     BACKGROUND ...................................................................................................2

        A.      The Global Pandemic ................................................................................2

        B.      Nevada's Response to the Global Pandemic...........................................4

        C.      Directive 21 and Calvary's Allegations ...................................................5

                1.      Mass Gatherings Generally ...........................................................5

                2.      Numerous Other Venues Are Limited to No More than 50 People.....6

                3.      Communities of Worship and Faith-Based Organizations .................6

III.    LEGAL STANDARD FOR INJUNCTIVE RELIEF ........................................7

IV.     LEGAL ARGUMENT...........................................................................................8

        A.      Calvary is Unlikely to Succeed on the Merits of its Claims ...........................8

                1.      The Exercise of Emergency Police Powers During a Public Health
                        Crisis Warrants Additional Deference by a Court ...............................8

                2.      The Directives do not Violate the Free Exercise Clause.....................12

                        a.      The Directives are Generally Applicable ...................................12

                        b.      The Directives are Neutral...........................................................13

                        c.      The Directives are not Individual Exemptions..........................16

                3.      The Directives do not otherwise Violate the First Amendment ..........16

                4.      The Directives Comply with Rational Basis Review............................17

        B.      Calvary is Unlikely to Suffer Irreparable Harm without an Injunction .......18

        C.      The Balance of the Equities Favors Protecting Nevadans ............................18

        D.      Denying the Injunction Protests Nevadans from Worsened Risk
                of COVID-19 ............................................................................................19

V.      CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**<u>CASES</u>**                                                                                                                 **<u>Page(s)</u>**

*Antietam Battlefield KOA v. Hogan,*
No. CV CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020) .............................15

*Boone v. Boozman,*
27 F.Supp.2d 938 (E.D. Ark. 2002)....................................................................................9

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................................................................................12, 17

*Calvary Chapel of Bangor v. Mills,*
Case No. 1:20-cv-00156-NT, 2020 WL 2310913 (D. Me. May 9, 2020) ....................15

*Cassell v. Snyders,*
Case No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020)..............................15

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) ..............................................................................................12-14, 17

*Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health,*
186 U.S. 380, 387 (1902) ....................................................................................................8

*Cross Culture Christian Center et al. v. Newsom,*
Case No. 2:20-cv-00832-JAM-CKD, 2020 WL 2121111 (E.D. Calif. May 5, 2020)...15

*Elim Romanian Pentecostal Church et al. v. Pritzker,*
Case No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020)...........................10, 14

*Employment Division v. Smith,*
494 U.S. 872 (1990) ............................................................................................................12

*Fox Broad. Co. v. Dish Network L.L.C.,*
747 F.3d 1060 (9th Cir. 2014) ..............................................................................................7

*Gibbons v. Ogden,*
22 U.S. 1 (1824) .................................................................................................................19

*Gish v. Newsom,*
2020 WL 1979970 (Apr. 23, 2020) ...............................................................................12, 15

*In re Abbott,*
954 F.3d 772 (5th Cir. 2020) ...........................................................................................10

*Jacobson v. Massachusetts,*
197 U.S. 11 (1905) ..............................................................................................................9

*Legacy Church, Inc. v. Kunkel,*
Case No. Civ. 20-0327 JB/SCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020).............15

*Liberian Cmty. Ass'n of Connecticut v. Malloy,*
2017 WL 4897048 (D. Conn. Mar. 30, 2017)..................................................................9

/ / /

*Lighthouse Fellowship Church v. Northam,*
  Case No. 2:20cv204, 2020 WL 2110416 (E.D. Va. May 1, 2020) ...............................15

*Maryville Baptist Church v. Beshear,*
  957 F.3d 610 (6th Cir. 2020) .....................................................................15

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n.,*
  138 S.Ct. 1719 (2018) .............................................................................13

*Prince v. Massachusetts,*
  321 U.S. 158 (1944) ........................................................................9, 11, 18

*South Bay United Pentecostal Church, et al. v. Newsom, et al.,*
  Case No. 19A1044, 2020 WL 2813056 (May 29, 2020) ..........................10-11, 14, 17

*Spell v. Edwards,*
  2020 WL 2509078 (M.D. La. May 15, 2020) ...............................................15

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .........................................................................7, 18-19

## STATUTES AND REGULATIONS

NRS 414.0345 ...............................................................................................5

NRS 414.035 .................................................................................................5

## OTHER AUTHORITY

CDC Coronavirus Disease 2019, Social Distancing (last accessed May 27, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html ...3

Coronavirus Resource Center, COVID-19 Map (last visited May 27, 2020),
https://coronavirus.jhu.edu/map.html ......................................................................3

Fed. R. Evid. 201 ..............................................................................................4

Nevada Governor's website,
http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/ ...............................4

Rothstein, Mark A., *From SARS to Ebola: Legal and Ethical Considerations for Modern
Quarantine*, 12 Ind. Health L. Rev. 227 (2015) ......................................................8

Social Distancing (last accessed May 27, 2020),
https://nvhealthresponse.nv.gov/info/event-organizers/ ...........................................4

Sui-Lee Wade and Donald G. McNeil, Jr., *China Identifies
New Virus Causing Pneumonialike Illness*, N.Y. TIMES (Jan. 8, 2020),
http://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html ..........2

The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread
(Mar. 31, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_
coronavirus-guidance_8.5x11_315PM.pdf .............................................................4

iii

White House, https://whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ ............3, 19

White House, Opening Up America Again (last accessed May 27, 2020), https://www.whitehouse.gov/openingamerica/ ........................................................................4

WHO Director-General's Opening Remarks (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 ........................................................................3

Defendants Steve Sisolak, in his official capacity as the Governor of Nevada and Aaron D. Ford, in his official capacity as Attorney General of Nevada (collectively "Defendants") hereby oppose Plaintiff Calvary Chapel Dayton Valley's ("Plaintiff" or "Calvary") Emergency Motion for Preliminary Injunction.

This opposition is made and based upon all matters of record herein, the Memorandum of Points and Authorities submitted herewith, and upon such oral arguments as the court may allow at the time of hearing of this matter

DATED this 2nd day of June, 2020.

AARON D. FORD
Attorney General

By: /s/ Craig A. Newby
    CRAIG A. NEWBY (Bar No. 8591)
    Deputy Solicitor General
    State of Nevada
    Office of the Attorney General
    555 E. Washington Avenue, Suite 3900
    Las Vegas, NV  89101

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Nevada, like all other states, has declared an emergency to protect lives from the COVID-19 global pandemic.  Following scientific evidence and federal guidelines, Nevada has implemented social distancing to protect Nevadans from COVID-19 to mitigate the risk of exposure and spread.  Social distancing involves, among other things, the distance between people and the length of time people are exposed to each other.  To minimize the risk of transmitting COVID-19, social distancing requirements for larger gatherings where people congregate together for extended periods of time need to be different than requirements for individuals to engage in commerce.  Nevada's actions have "flattened the curve," and efforts continue to reopen the state slowly to ensure that the economic sacrifices made to achieve this were not in vain.  The reopening effort included Directive 021, issued last Thursday, providing that religious organizations could begin conducting services (including Sunday), under similar limitations placed on other mass gatherings and live entertainment events.

Here, Plaintiff Calvary Chapel Dayton Valley ("Plaintiff" or "Calvary") seeks a preliminary injunction on the mistaken premise that Nevada's directives treat religious organizations differently than similar mass gatherings.  This is not true.  Last Friday, the United States Supreme Court denied an injunction for a church that also sought to open last Sunday.  There, as set forth below, the Supreme Court recognized that social distancing is different for mass gatherings than for commerce, and that there is a rational basis for this distinction.

For this reason and the others set forth below, Calvary is unlikely to succeed on the merits in this case.  For the foregoing reasons, the motion must be denied.

## II.   BACKGROUND

### A.   The Global Pandemic

In January 2020, China identified a novel coronavirus causing what we now know as COVID-19.  Sui-Lee Wade and Donald G. McNeil, Jr., *China Identifies New Virus*

*Causing   Pneumonialike   Illness*,   N.Y.   Times   (Jan.   8,   2020), http://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html.   Less than three months later, on March 11, 2020, the World Health Organization ("WHO") declared COVID-19 to be a pandemic.  *See* WHO Director-General's Opening Remarks (Mar.  11,  2020),  https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.   The WHO "called … for countries to take urgent and aggressive action …." *Id.*  The White House similarly declared an   emergency   on   March   13,   2020.   https://whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  Upon information and belief, each state has declared an emergency as a result of COVID-19.

Despite this urging, COVID-19 spread quickly across the United States.  To date, more than five million people worldwide have been diagnosed as infected with COVID-19. *See* Johns Hopkins Medical Center:  Coronavirus Resource Center, COVID-19 Map (last visited May 27, 2020), https://coronavirus.jhu.edu/map.html.  Approximately 30% of those diagnoses are in the United States.  *Id.*  More than three hundred fifty thousand people have died worldwide, of which approximately one hundred thousand are Americans.  *Id.* There currently is no vaccine.

Based on how COVID-19 is spread, the CDC recommends that everyone practice social distancing.  According to the Centers for Disease Control and Prevention ("CDC"), "[l]imiting face-to-face contact with others is the best way to reduce the spread of coronavirus disease 2019 (COVID-19)."  *See* CDC Coronavirus Disease 2019, Social Distancing   (last   accessed   May   27,   2020),   https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.  To practice social or physical distancing, the CDC recommends that people do not gather in groups, stay out of crowded places, and avoid mass gatherings.  *Id.*  The CDC further recommends avoiding "gatherings of any size outside your household."  *Id.*

/ / /

Simply put:

> When it comes to gatherings, the risk is not just based on how many people there are, but rather how closely they are gathered and how they are interacting with each other. The risk does not disappear in smaller gatherings. It's the distance and precautions that will make the difference.

*See* Social Distancing (last accessed May 27, 2020), https://nvhealthresponse.nv.gov/info/event-organizers/.

Consistent with this practice, the White House issued guidance intended to slow the spread of COVID-19, including recommendations that all people avoid social gatherings of more than ten people and that indoor/outdoor venues, where groups of people congregate and there is evidence of community transition, close. *See* The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread (Mar. 31, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf. Even now, according to Phase Two of the White House's "Opening Up America Again" guidelines, "[s]ocial settings of more than 50 people, where appropriate distancing may not be practical, should be avoided unless precautionary measures are observed." White House, Opening Up America Again (last accessed May 27, 2020), https://www.whitehouse.gov/openingamerica/.

Simply put, COVID-19 remains a clear, present danger to the United States, Nevada, and the world.

### B.   Nevada's Response to the Global Pandemic

Given the recommendations of the WHO and the CDC, Governor Sisolak declared a state of emergency on March 12, 2020.[1] He did so pursuant to his authority under the laws and constitution of the State of Nevada to contain the spread of COVID-19.

/ / /

/ / /

---

[1] Defendants request that the Court take judicial notice of Nevada's emergency declaration and subsequent directives pursuant to Fed. R. Evid. 201. These documents are located on the Nevada Governor's website at http://gov.nv.gov/News/Emergency_Orders/Emergency_Orders/.

Nevada law defines an "emergency" as:

> [A]n occurrence or threatened occurrence for which, in the determination of the Governor, the assistance of state agencies is needed to supplement the efforts and capabilities of political subdivisions to save lives, protect property and protect the health and safety and persons in this state, or to avert the threat of damage to property or injury to or the death of persons in this state.

NRS 414.0345.   Under NRS 414.035, emergency management is "the preparation for and the carrying out of all emergency functions, . . ., to minimize injury and repair damage resulting from emergencies or disasters caused by . . . natural causes."  *Id.*

Subsequently, Governor Sisolak issued a series of emergency directives to mitigate community spread of COVID-19 and provide a framework for social distancing consistent with CDC guidelines as well as best practices adopted by the majority of other states.  To the extent Calvary contends that the most recent directive violates its constitutional rights, it shall be reviewed in more detail.

## C.   Directive 21 and Calvary's Allegations

Directive 021 implements Phase 2 of Nevada's reopening.  A true and correct copy of Directive 021 is attached hereto as **Exhibit A**.  Notably, this directive was finalized <u>after</u> Calvary filed this motion, in which Calvary makes mistaken assumptions regarding mass gathering restrictions.  Accordingly, it requires detailed review to consider how it treats religious organizations relative to other social gatherings that are most similar to it in how people congregate together and communicate.

### 1.   Mass Gatherings Generally

Section 10 of Directive 021 addresses mass gatherings generally.  It increases the limit for mass gatherings to up to 50 people.

It specifically reads as follows:

> SECTION 10: Section 1 of Directive 007 is hereby further amended to provide that effective 12:01 am on May 29, 2020, the Nevada general public shall not gather in groups of more than fifty in any indoor or outdoor area subject to the limitations of this section, whether publicly owned or privately owned where the public has access by right or invitation, express or implied,

whether by payment of money or not.  Section 3 of Directive 007 shall remain in force.

As alleged by Calvary, religious organizations are being treated the same as mass gatherings of the general public.

### 2.   Numerous Other Venues Are Limited to No More than 50 People

Directive 021 imposes limits to the lesser of 50% occupancy or 50 people to numerous activities and venues within Nevada.  These include:

- Non-retail indoor venues, such as movie theatres, bowling alleys, and arcades; (*see id.* at § 20)

- Museums, art galleries, zoos, and aquariums; (*see id.* at § 30) and

- Trade schools and technical schools.  *Id.* at § 32.

Further, Directive 021 maintains stricter limits on live performances of all types, prohibiting spectators.  Specifically, Section 22 states:

> SECTION 22: Effective 12:01 am on May 29, 2020, musical performances, live entertainment, concerts, competitions, sporting events, and any events with live performances may resume, but shall remain closed for public attendance.  Events held pursuant to this section may be recorded, filmed, streamed or broadcast to the public.  Live events ordinarily regulated by the Nevada Athletic Commission or the Nevada Gaming Control Board must be approved by the applicable board prior to the event.  All other live events under this Section must be approved by the Nevada Department of Business & Industry, Division of Industrial Relations prior to the event.  Events held pursuant to this Section must additionally comply with all guidance promulgated by NV OSHA.

### 3.   Communities of Worship and Faith-Based Organizations

With this context, it now makes sense to consider the provision Calvary contests.  Section 11 of Directive 021 addresses communities of worship and faith-based organizations.  Identical to mass gatherings generally and with equal treatment as to numerous other gatherings, services are limited to fifty people.  Specifically, this provision reads as follows:

> SECTION 11: Communities of worship and faith-based organizations, including without limitation, churches, synagogues, mosques, and temples, are strongly encouraged to

offer online and drive-up services to the greatest extent possible. Effective 12:01 am on May 29, 2020, consistent with other Directives on public gatherings, houses of worship may conduct indoor in-person services in a manner so that no more than fifty persons are gathered, and all social distancing requirements are satisfied. This limitation shall not apply to houses of worship offering drive-up services pursuant to Section 10 of Directive 016. Houses of worship offering indoor, in-person services are encouraged to follow the guidelines promulgated by the LEAP, as well as the following provisions that are consistent with other Directives on public gatherings:

(1)    Seating must be arranged to ensure a minimum of six feet of separation between congregants who do not reside in the same household.

(2)    Participants, including leaders and staff, are encouraged to utilize face coverings to the greatest extent practicable.

(3)    Houses of worship are encouraged to stagger services so that the entrance and egress of congregants for different services do not result in a gathering greater than fifty persons, and to provide proper sanitation between services.

Plain comparison of the Directive 021 provisions highlights the same treatment for similar types of gatherings, premised on their relatively higher risk of COVID-19 transmission. It is rational and warranted as Nevada continues to ensure safety, which will allow its person-based tourism economy to recover and succeed again. Complaints that mass gatherings must be treated the same as commerce, which involves entirely different lengths and types of person-to-person contact, have been rejected by numerous courts through the United States, including the Supreme Court and the Ninth Circuit, and must be rejected here.

This motion must be denied.

## III.    LEGAL STANDARD FOR INJUNCTIVE RELIEF

To obtain a preliminary injunction, Calvary must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This traditional test applies absent Plaintiff's ability to demonstrate that the balance of equities tips sharply in their favor. *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1066 n.2 (9th Cir. 2014).

Calvary cannot meet this burden because they are unlikely to succeed on the merits of their claim.  Further, Calvary cannot demonstrate irreparable harm, as nothing prevents them from offering additional services if necessary to accommodate all congregants.

Finally, the balance of equities and the public interest during these unprecedented times weigh heavily against injunctive relief.  Nevada is in the midst of an extended public health emergency.  Its efforts to mitigate the spread of COVID-19 to avoid overwhelming health resources have worked thus far.  Temporary, narrowing restrictions on the size of mass gatherings, including for religious services, do not outbalance the health and well-being of all Nevada citizens.  In light of the tremendous uncertainty continuing to surround this new and deadly virus, it would be rash to eliminate the entire restriction for this certain type of mass gathering before public-health officials have had the opportunity to evaluate evidence of the policy's effectiveness in practice.

The motion should be denied.

## IV.   LEGAL ARGUMENT

### A.   Calvary is Unlikely to Succeed on the Merits of its Claims

#### 1.   The Exercise of Emergency Police Powers During a Public Health Crisis Warrants Additional Deference by a Court

Nevada's power to regulate public health and safety, including the greater power of quarantine, predate the Constitution.[2]   The Supreme Court has recognized that the Constitution's reserves power to the states to regulate public health, safety, and morals. *Gibbons v. Ogden*, 22 U.S. 1 (1824).  The United States Supreme Court has explicitly upheld the exercise of broad quarantine powers by the states. *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health*, 186 U.S. 380, 387 (1902).

/ / /

/ / /

---

[2] The earliest law providing for quarantine was enacted by the Massachusetts Bay Colony in 1647 to quarantine ships from the West Indies due to the threat of plague. Rothstein, Mark A., *From SARS to Ebola: Legal and Ethical Considerations for Modern Quarantine*, 12 Ind. Health L. Rev. 227, 230 (2015).  The quarantine power was especially important in port cities, such as New York and Boston. *Id.*

More recently, though more than one hundred years ago, the Supreme Court established a framework governing the emergency exercise of state authority during a public health crisis. *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).

Facing a compulsory vaccination law enacted during the smallpox epidemic, the Court described the state's police power to combat an epidemic:

> In every well-ordered society charged with the duty of conserving the safety of its members, the rights of the individual in respect to his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the public may demand.

*Id.* at 29.

There, the Court held that when a state exercises emergency police powers to enact an emergency public health measure, courts will uphold it unless (1) there is no real or substantial relation to public health, or (2) the measures are "beyond all question" a "plain palpable violation of rights secured by the fundamental law." *Id.* at 30. This recognizes that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 28. As the Court explained, "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." *Jacobson*, 197 U.S. at 26-27. The Court further held that during public health crises, "it is no part of the function of a court …to determine which of two modes was likely to be the most effective for the protection of the public against disease." *Id.* at 30.

Courts throughout the past century have consistently applied *Jacobson* to public health emergencies. *See, e.g., Liberian Cmty. Ass'n of Connecticut v. Malloy*, 2017 WL 4897048, at *10 (D. Conn. Mar. 30, 2017) (applying *Jacobson* standard to Ebola quarantine); *Boone v. Boozman*, 217 F.Supp.2d 938, 954 (E.D. Ark. 2002) (applying *Jacobson* standard to compulsory school immunization); *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944) (applying *Jacobson* framework stating the "[r]ight to practice religion freely does not include the liberty to expose the community. . . to communicable diseases").

During the current global pandemic, courts have applied *Jacobson* as well.  *See, e.g., In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (applying *Jacobson* framework to constitutional challenge to executive order by Texas Governor relating to COVID-19); *Elim Romanian Pentecostal Church et al. v. Pritzker*, Case No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020).

Last Friday, May 29th, the Supreme Court denied injunctive relief for a California church challenging California's similar temporary restrictions on public gatherings in light of the COVID-19 crisis, reaffirming the applicability of *Jacobson*.[3]  *See South Bay United Pentecostal Church, et al. v. Newsom, et al.* Case No. 19A1044, 2020 WL 2813056 at *1 (May 29, 2020), a true and correct copy of which is attached hereto as **Exhibit B**.  There, the Court rejected injunctive relief, consistent with the Ninth Circuit's denial of injunctive relief.  *Id.*

To begin with, the Supreme Court noted the difference between mass gatherings and commerce.  Specifically, the Court stated that California's restrictions "apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time."  *Id.*  The Court further noted that California's restrictions are more lenient for dissimilar activities, "in which people neither congregate in large groups nor remain in close proximity for extended periods."  *Id.*

Next, the Supreme Court reaffirmed *Jacobson* and the discretion of state officials such as Defendant to make emergency public health determinations.  Specifically, the Court noted that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *Id.* (quoting *Jacobson*, 197 U.S. at 38).  Further, the Court held that when "those officials 'undertake [ ] to act in areas fraught with medical and scientific uncertainties,' their

---

[3] California's restriction was the lesser of 25% of building capacity or a maximum 100 attendees.  Such a restriction, applied to Calvary, would limit Calvary to approximately 45 people per service. *See* Mot. at 3:15-19.  In short, the California order is <u>more restrictive</u> than Nevada's emergency directive, yet the United States Supreme Court denied injunctive relief.

latitude 'must be especially broad.'" *South Bay*, 2020 WL 2813056 at *1 (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).   Finally, "[w]here those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people.'"   *Id.* (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)).

Under *Jacobson*, as reaffirmed by South Bay, Plaintiffs cannot prevail.   First, Calvary cannot establish that the emergency declaration and related directives have no real or substantial relation to public health.   More than one hundred thousand Americans have died so far.   Hospitals were overrun in Italy and New York City.   Until there is a vaccine, the primary method for preserving a "flattened curve" is social distancing.   Social distancing has been recommended by the World Health Organization, the CDC, and the federal government.   Reducing prolonged exposure warrants limitations on mass gatherings, such as those set forth in Directive 021 for a variety of activities and venues, specifically including faith-based organizations.

Moreover, and as set forth above, mass gatherings are different than commerce, based on the length of time a person is exposed to others who may be infected with COVID-19.   The emergency declaration and subsequent directives have addressed this public health risk.   Similar to California's order at issue in *South Bay*, comparable secular gatherings are subject to similar or more severe restrictions than places of worship, while dissimilar commerce activities where people neither congregate in large groups nor remain in close proximity for extended periods are treated more leniently.

Second, Calvary cannot establish that the emergency declaration and related directives are "beyond all question" a "plain palpable violation of rights secured by the fundamental law."   To be sure, the free exercise of religion is constitutionally protected. But as Supreme Court stated in *Prince v. Massachusetts,* the "[r]ight to practice religion freely does not include the liberty to expose the community. . . to communicable diseases". 321 U.S. at 166-67.

In fact, Defendants submit that the emergency declaration and related directives comply with the United States and Nevada Constitutions even if this was an ordinary exercise of the State's police power, versus the emergency currently faced by the United States, Nevada, and the world.  Calvary's claims will be analyzed under those standards below.

## 2.    The Directives do not Violate the Free Exercise Clause

Under traditional analysis of the Free Exercise Clause, "neutral, generally applicable laws" are subject to rational basis review, even where they are applied to religious practices.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014); *see also Employment Division v. Smith*, 494 U.S. 872 (1990).  In short, if the Orders do not target religion, "the First Amendment has not been offended."  *Employment Division*, 494 U.S. at 878.  Because the Directives at issue in this case are neutral laws of general applicability, rationally based on the State's goals of mitigating the spread and contraction of COVID-19, similar to what the Supreme Court determined to "appear consistent with the Free Exercise Clause of the First Amendment," Plaintiffs' claims fail.

### a.    The Directives are Generally Applicable

These orders are generally applicable.  As the Supreme Court explained in *Lukumi*, although "[a]ll laws are selective to some extent, …categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice."  *Lukumi*, 508 U.S. at 542.  Even "in pursuit of legitimate interests," the government "cannot in a selective manner impose burdens only on conduct motivated by religious belief."  *Id.* at 543.

Calvary ignores the difference in type of assembly as the entities – both religious and secular – that are subject to the orders.  Schools (to the extent open at all), live concert halls, movie theatres, and sports venues that wish to have spectators are burdened similarly to faith-based organizations. The places covered are places where "people sit together in an enclosed space to share a communal experience."  *Gish v. Newsom*, 2020 WL 1979970 (Apr. 23, 2020).  The Governor has not selectively "impose[d] burdens only on

/ / /

1   "religious conduct, but rather equally on all types of conduct that are likely to spread

2   COVID-19.  *See Lukumi*, 508 U.S. at 543.

3                         **b.      The Directives are Neutral**

4          A law is not neutral if its object is to "infringe upon or restrict practices because of

5   their religious motivation."  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S.

6   520, 533 (1993).  A lack of neutrality can be clear from the face of the law if it "refers to a

7   religious practice without a secular meaning discernable from the language or context."  *Id.*

8   But the Free Exercise Clause also forbids "subtle departures from neutrality," including

9   evidence of bias that might not be reflected in the law's text.  *Masterpiece Cakeshop, Ltd.*

10  *v. Colo. Civil Rights Comm'n.*, 138 S.Ct. 1719, 1731 (2018).

11         In determining if a law's object is neutral, courts consider "the effect of [the] law in

12  its real operation" and often call upon principles developed in equal protection cases.

13  *Lukumi*, 508 U.S. at 535, 540.  Thus, a law will be found to violate the Free Exercise Clause

14  if it was enacted "because of," not merely "in spite of," its restrictions on religious practice.

15  *Id.* at 540.  Relevant evidence on this point can include a proscription of religious activity

16  in a way not applied to comparable secular activity; a "pattern" of "animosity" towards the

17  religious group be the drafters; and the suppression of "much more religious conduct that

18  is necessary" to achieve the asserted, legitimate purposes.  *Id.* at 536, 542, 543.

19         Here, the Directives are plainly neutral.  They prohibit all mass gatherings

20  exceeding fifty people, whether general mass gatherings, religious services, movie theaters,

21  or trade schools.  They prohibit live entertainment venues from having any spectators.

22  Calvary offers no facts suggesting that Governor Sisolak has any animus towards religious

23  organizations.  Moreover, churches remain free to conduct drive-in services, online

24  programs, and in-person assemblies of up to fifty people, consistent with the White House's

25  Phase 2 guideline.  Merely referencing religious activity separately as part of a list of

26  broader mass gatherings covered by the fifty-person limit does not show that the order's

27  "object or purpose" was to target religious activity for harsher treatment.  *Id.* at 533.

28  Instead, the orders are designed to restrict only the aspects of the religious conduct – the

large, in-person gatherings for extended time periods – that undermine the secular purpose of slowing the spread of COVID-19.  This in no way suppresses "much more religious conduct that is necessary" to achieve the goal of mitigation and "flattening the curve" during the current pandemic.

Nevertheless, Calvary asserts that the orders are not neutral because religious organizations are being treated differently than businesses.  Mot. at 7:1-8:24.  In this Free Exercise analysis, however, the question is not whether any secular entity faces fewer restrictions than any religious one.   To be comparable, the secular conduct must "endanger[] [the government's] interests in a similar or greater degree than" the religious conduct.  *Lukumi*, 508 U.S. at 543. And box stores, grocery stores, and construction sites, characterized by transiency and …, simply do not pose the same amount of threat of exposure to and spread of COVID-19 as do religious institutions that hold hours-long services with its congregants sitting in close proximity.  Such has been the finding in the majority of cases nationwide, which have rejected challenges to similar orders.

The Supreme Court upheld this analysis in *South Bay United Pentecostal Church, et al. v. Newsom, et al.* Case No. 19A1044, 2020 WL 2813056 at *1 (May 29, 2020).  Prior to the Supreme Court's consideration, the Ninth Circuit upheld the denial of a request for injunctive relief tied to holding <u>any</u> in-person religious services pursuant to the State of California and County of San Diego's stay-at-home orders.  Case No. 20-55533, 2020 WL 2687079 (9th Cir. May 22, 2020).  Similarly, the Seventh Circuit denied a request for injunctive relief on a free-exercise claim against Illinois' emergency orders, recognizing that the temporary numerical restrictions applied "also to the most comparable types of secular gatherings, such as concerts, lectures, theatrical performances, or choir practices, in which groups of people gather together for extended periods, especially where speech and singing feature prominently and raise risks of transmitting the COVID-19 virus." *Elim Romanian Pentecostal Church et al. v. Pritzker*, Case No. 20-1811, 2020 WL 2517093 (7th Cir. May 16, 2020).   The Seventh Circuit further observed that "[w]orship services do not seem

14

comparable to secular activities permitted under the Executive Order, such as shopping, in which people do not congregate or remain for extended periods." *Id.*

Two district courts within this circuit have likewise rejected Free Exercise challenges to California's emergency orders.  In *Cross Culture Christian Center et al. v. Newsom*, the court recognized the difference between individuals purchasing various items as different than in-person church services, which are designed to be a communal experience, one for which a large group of individuals come together at the same time in the same place for the same purpose.  *See Cross Culture Christian Center et al. v. Newsom*, Case No. 2:20-cv-00832-JAM-CKD, 2020 WL 2121111, at *6 (E.D. Calif. May 5, 2020), (internal quotations omitted).  Instead, the court found that in-person religious services are more akin to attending concerts and sporting events.  *Id.*

Similarly, in *Gish v. Newsom*, the district court noted that "[a]n in-person religious gathering is not analogous to picking up groceries, food, or medicine, where people enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete."[4]   *Gish v. Newsom*, Case No. EDCV-20-755JGB (KKx), 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020).

In this context, where the Supreme Court has weighed in on substantively the same legal issue, Calvary's reliance on *Maryville Baptist Church v. Beshear* is misplaced. 957 F.3d 610 (6th Cir. 2020). There, the Sixth Circuit did not consider the differences between commerce and in-person church services, as did the Supreme Court, the Seventh Circuit, and the Ninth Circuit, before overturning the emergency order at issue. And in *Roberts v. Neace*, the Sixth Circuit actually stated that the "straightforward remedy" for addressing the in-person religious services risk was to "limit the number of people who can attend a

---

[4] Other district courts have resolved Free Exercise challenges the same way.  *See, e.g.*, *Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 2556496, at *7–9 (D. Md. May 20, 2020); *Legacy Church, Inc. v. Kunkel*, Case No. Civ. 20-0327 JB/SCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020); *Cassell v. Snyders*, Case No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020); *Lighthouse Fellowship Church v. Northam*, Case No. 2:20cv204, 2020 WL 2110416, at *8 (E.D. Va. May 1, 2020); *Calvary Chapel of Bangor v. Mills*, Case No. 1:20-cv-00156-NT, 2020 WL 2310913, at *8 (D. Me. May 9, 2020); *Spell v. Edwards*, 2020 WL 2509078 (M.D. La. May 15, 2020).

service at one time." 958 F.3d 409, *5 (6th Cir. 2020).   Consistent with White House guidance, this is precisely what Nevada has done for *all* mass gatherings, including at churches.  The Supreme Court has rejected this argument.

This court should reject this argument as well.

### c.    The Directives are not Individual Exemptions

As was argued in South Bay by the church, Calvary argues that Nevada's emergency directives constitute "a system of individual exemptions," such that they trigger strict scrutiny.[5] Mot. at 15:1-5.  The Supreme Court rejected this argument by not applying strict scrutiny when denying South Bay's request for injunctive relief.

Further, there are no facts supporting Calvary's characterization that the Governor has created "a system of individual exemptions."  As set forth above, this is simply untrue. Faith-based organizations are being treated the same or more favorably that other mass gatherings, which share similar risks for spreading COVID-19.   None are allowed more than 50 people to be in one locations congregated together.  This is not a case where a lower-level government official is making individualized determinations of whether an unemployed person refused to work "without good cause."   Instead, the Nevada Constitution and the Nevada Legislature has provided the Governor with the authority to declare a public health emergency and take action to stop it, consistent with what the federal government and every other state has done.  It has not been used as Calvary mistakenly argues here.  This argument for strict scrutiny must fail.

### 3.    The Directives do not otherwise Violate the First Amendment

Calvary argues that "the State has banned the Church from holding worship services on its own property."  Mot. at 16:21-22.  This is simply not true, as Calvary was free to conduct worship services (or any other mass gathering) on its own property for up to 50 people at a time, subject to social distancing and other sanitary requirements.  *See* **Ex. A**. / / /

---

[5] *See* Emergency Application for Writ of Injunction (May 26, 2020) at 20-22, a true and correct copy of which is attached hereto as **Exhibit C**.

Calvary also continues to have the freedom of expression and speech through online or drive-in services.

Calvary's argument that similar temporary restrictions are not imposed on other expressive activities is not true.  As addressed above, museums, movie theatres, and art galleries are subject to similar maximum attendance of 50 people and live performance venues are not yet allowed to have any spectators.  *See id.*  Simply put, Nevada's emergency declaration and subsequent directives do not regulate the content of any expression.

Accordingly, strict scrutiny does not apply to Nevada's emergency declaration and subsequent directives on this basis.

### 4.      The Directives Comply with Rational Basis Review

Because the orders are neutral and generally applicable, Calvary has to show that they are unsupported by a rational basis to prevail.  *See Burwell v. Hobby Lobby stores, Inc.*, 573 U.S. 682, 694 (2014).  Given the State's interest in limiting the spread of COVID-19, a highly contagious illness that spreads more easily through close contact, Calvary is unable to make such a showing.

Further, Calvary's analysis as to why the emergency directives do not constitute the "least restrictive means" of furthering any compelling interest highlights why *Jacobson* and *South Bay* provide state officials with added discretion when exercising emergency police powers.  It is not the place of Calvary, Calvary's counsel, or this court to exercise discretion on where or how to protect public health against a novel, highly contagious virus.

Here, the Governor's Orders were developed in response to an emergency situation. *Id.* at 543.  Unlike the ordinance at issue in *Lukumi*, the Governor's Orders do not "pursue the [State]'s governmental interests only against conduct motivated by religious belief." *Id.* at 545.  There were not "gerrymandered with care to proscribe religious" gatherings.  *Id.* at 521. Rather, the Directives pursue the goal of slowing the spread of a deadly pandemic and saving lives by closing temporarily all places where more than fifty people might gather, subject to certain exceptions that are themselves designed carefully to preserve life, health,

/ / /

17

and livelihood.  This specifically includes grocery stores to provide food allowing people to cook while staying at home.  *Cf. id.* at 537.

The Governor's Orders are neutral and generally applicable.  They are facially neutral, do not "target" religious establishments, and are not underinclusive.  Again, "[t]he right to practice religion freely does not include liberty to expose the community …to communicable disease…ill health or death." *Prince v. Massachusetts*, 312 U.S. 158, 166-67 (1944). For these reasons, Calvary is unlikely to succeed on the merits of its Free Exercise claim.  This warrants denial of the motion.

**B.    Calvary is Unlikely to Suffer Irreparable Harm without an Injunction**

Here, Calvary was already allowed to conduct in-person church services for up to 50 people a service, while continuing virtual services.  Simply doubling the number of existing church services would allow Calvary to conduct in-person church services for its entire congregation.   Particularly where these mass gathering requirements are generally applicable, there is no factual basis for concluding that Calvary has or will suffer irreparable harm.

**C.    The Balance of the Equities Favors Protecting Nevadans**

To prevail on their Motion, Calvary must also show that the balance of the equities weigh in their favor. It does not.

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations omitted).

Here, Calvary presumes it should be treated the same as a business operating in commerce, ignoring the difference between commerce and mass gatherings for purposes of COVID-19 risk.  The Supreme Court and the Ninth Circuit have rejected ignoring these differences.  In contrast, the Governor has an obligation to protect Nevadans' health and well-being, based on the risk.  Consistent with White House guidelines for mass gatherings, the Governor has implemented directives to slowly reopen Nevada to ensure the curve stays

flat and that there is not a need to revert back to earlier phases that required further sacrifices from all Nevadans to remain safe.

### D. Denying the Injunction Protects Nevadans from Worsened Risk of COVID-19

Calvary must also demonstrate that the granting of its Motion is in the public interest. It is not.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Similar to *Winter's* consideration of military interests, Nevada is currently in battle with the most significant public health emergency in over a century. To be clear, after the World Health Organization declared a pandemic, President Trump declared a nationwide emergency on March 13, 2020. *See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. Governor Sisolak declared a Nevada emergency on March 12, 2020. Both the state and federal emergencies remain in effect.

There is no genuine doubt that Nevada has the power to protect the health of its citizens, particularly in an emergency such as this. Prior to ratification of the Constitution, various colonies had quarantine laws, thereby establishing the legal tradition of local and state jurisdiction over matters of public health reflected in the Constitution's reservation of power to the states to regulate public health, safety, and morals. *Gibbons v. Ogden*, 22 U.S. 1 (1824).

It is in this context that Calvary seeks to substitute its judgment of the public interest, seeking preference over any other mass gathering, for those representing us in the local, state, and federal government.

This prong strongly warrants denial of the motion.

/ / /

/ / /

/ / /

## V.   CONCLUSION

Nevada has had a successful beginning to its fight to limit death and injury associated with COVID-19.  This Court should not substitute its judgment for that of the Governor during this ongoing emergency, particularly where Calvary is unlikely to succeed on the merits of any claim.

The motion for preliminary injunction should be denied.

Dated: June 2nd, 2020.

AARON D. FORD
Attorney General

By: /s/ Craig A. Newby
CRAIG A. NEWBY (Bar No. 8591)
Deputy Solicitor General
State of Nevada
Office of the Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101

**CERTIFICATE OF SERVICE**

   I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on this 2nd day of June, 2020, I electronically filed the foregoing document, **OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION,** with the Clerk of the Court by using the CM/ECF system.

   Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

        /s/ *Kristalei Wolfe*
        Kristalei Wolfe
        State of Nevada,
        Office of the Attorney General

## INDEX OF EXHIBITS

| EXHIBIT NO. | EXHIBIT DESCRIPTION | NUMBER OF PAGES |
|---|---|---|
| A | Directive 021 | 14 |
| B | *See South Bay United Pentecostal Church, et al. v. Newsom, et al.* Case No. 19A1044, 2020 WL 2813056 at *1 (May 29, 2020) | 6 |
| C | Emergency Application for Writ of Injunction (May 26, 2020) at 20-22 | 43 |