**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| CALVARY CHAPEL DAYTON VALLEY<br><br>                          Plaintiff(s),<br><br>     v.<br><br>STEVE SISOLAK<br>AARON  FORD<br>FRANK HUNEWILL<br><br>                          Defendant(s). | Case No. 3:20-cv-00303-RFB-VCF<br><br>**ORDER** |

### I.     INTRODUCTION

Before the Court are Plaintiff Calvary Chapel Dayton Valley's ("Calvary" or "Plaintiff") Emergency Motions for a Temporary Restraining Order and Preliminary Injunction. ECF Nos. 9, 19. For the following reasons, the Court denies both motions without prejudice.

### II.    PROCEDURAL BACKGROUND

Plaintiff brought its initial complaint on May 22, 2020 and filed the operative amended complaint on May 28, 2020. ECF Nos. 1, 8. The complaint brought facial and as-applied First and Fourteenth Amendment challenges to Governor Sisolak's emergency directives in response to the COVID-19 pandemic. Id. Plaintiff filed a motion for a temporary restraining order and preliminary injunction on May 28 and May 29, 2020. ECF Nos. 9, 19. The Court denied Plaintiff's motion to consider the motions on an expedited basis. ECF Nos. 16, 23. Defendant Steve Sisolak responded to the motions on June 2, 2020. ECF Nos. 9, 19.  Defendant Frank Hunewill joined Defendant Sisolak's response on that same date. ECF No. 32.  Plaintiff filed a supplement to its motion on

June 4, 2020 and Defendant Sisolak responded on June 7, 2020. ECF Nos. 38, 39. The Court held a hearing on the motions on June 9, 2020. This written order now follows.

### III.  FACTUAL BACKGROUND

The Court makes the following findings of fact. Calvary Chapel Dayton Valley is a Christian church in Dayton, Nevada that has operated since February 5, 2006. Calvary believes that the Bible commands Christians to gather together in person for corporate prayer and worship. On March 16, 2020, in response to the ongoing coronavirus pandemic, Calvary suspended in-person worship services. However, Calvary sincerely believes that online services and drive-in services thwart the Bible's requirement of in-person services for corporate worship, and some church attendees do not have internet access and therefore are not able to participate in online services. Calvary therefore wishes to resume in-person services.

On May 26, 2020, Defendant Governor Sisolak announced that Nevada would enter "Phase Two" of its reopening. To that end, he issued Emergency Directive 021 on May 28, 2020 (hereinafter the "Emergency Directive" or "Directive"). The Emergency Directive permits several categories of business and social activity to resume, subject to different restrictions. For example, Section 10 of the directive prohibits gatherings in groups of more than fifty people in any indoor or outdoor areas. Emergency Directive 021, § 10. Communities of worship and faith-based organizations are allowed to conduct in-person services so long as no more than fifty people are gathered, while respecting social distancing requirements. Id. at § 11. Section 20 similarly limits movie theaters to a maximum of fifty people. Id. at §20. Section 35 of the Emergency Directive allows casinos to reopen at 50% their capacity and subject to further regulations promulgated by the Nevada Gaming Control Board. Id. at § 35.

### IV. LEGAL STANDARD

The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction. Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. 7, 20 (2008)). A preliminary injunction may also issue under the "serious questions" test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements. Id. at 1134-35 (citation omitted).

### V. DISCUSSION

The Court denies the motions because it finds that Plaintiff has not demonstrated a likelihood of success on its First Amendment Free Exercise claim. The Court examines both the facial and as-applied challenges to the Emergency Directive. The Court incorporates by reference its findings made on the record, which shall be construed consistent with this written ruling.

### a. Facial Challenge

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Am. Family Ass'n, Inc v. City & Cty. of San Francisco, 277 F.3d 1114, 1123 (9th Cir. 2002) (citing U.S. Const. amend. I). A regulation or law violates the Free Exercise clause when it is neither neutral nor generally applicable, substantially burdens a religious practice, and is not justified by a substantial state interest or narrowly tailored to achieve that interest. Id. (citing Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 531 – 32 (1993)).

The Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." Jacobson v. Massachusetts, 197 U. S. 11, 38 (1905). When state officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Marshall v. United States, 414 U. S. 417, 427 (1974).

The Supreme Court examined the relationship between COVID-19 related executive orders and the Free Exercise Clause in its recent order in South Bay United Pentecostal Church v. Newsom, No. 19A1044, 2020 WL 2813056 (May 29, 2020). In South Bay, the Supreme Court denied an application for injunctive relief enjoining enforcement of a portion of the California governor's executive order to limit the spread of COVID-19. Id. The order limited attendance at places of worship to 25% of building capacity or a maximum of 100 attendees. Id. at 1. The Supreme Court found that the restrictions appeared consistent with the Free Exercise Clause of the First Amendment. Id. Chief Justice Roberts first noted that "[s]imilar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for

extended periods of time." Id. Chief Justice Roberts then explained that the "[o]rder exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks or laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods." Id. Finally, Chief Justice Roberts concluded that, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and that when elected officials "act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Id. (internal citations omitted). "When those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence and expertise to assess public health and is not accountable to the people." Id. (internal citations omitted).

The Court finds the holding in South Bay applicable to this case and holds that the Emergency Directive is neutral and generally applicable and does not burden Plaintiff's First Amendment right to free exercise. Consequently, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of its claim.

Calvary argues that the Defendants in this case, based upon the plain language of the Emergency Directive, have violated the First Amendment by 'exceeding the limits' of their authority during a public health crisis. Calvary bases its argument on alleged differential treatment between itself and other secular organizations/activities. Calvary points to several secular businesses that it insists engage in comparable activity in which people gather in large groups and remain in close proximity for large periods of time, including casinos, restaurants, nail salons, massage centers, bars, gyms, bowling alleys and arcades, all of which are allowed to operate at 50% of official fire code capacity. Calvary specifically focuses on casinos and includes photos in

its briefing of crowded casino gaming centers, after the state reopened them on June 4. Given that any social behavior increases the risk of covid-19 transmission, Calvary argues, there is no scientific or medical reason to distinguish between places of worship and other comparable activities.

The Court agrees that church services may in some respects be similar to casinos, in that both are indoor locations in which a large number of people may remain in close proximity for an extended period of time. The Court, however, disagrees that casinos are actually treated more favorably than places of worship. During this phased reopening of Nevada by the Governor, casinos are subject to substantial restrictions and limitations required by the Nevada Gaming Control Board which exist *in addition* to and in conjunction with the requirements and oversight provided by the Emergency Directive. See Emergency Directive, § 35; Addendum to April 21, 2020 Policy Memorandum posted May 29, 2020; 2020-30 Updated Health and Safety Policies for Reopening after Temporary Closure posted May 27, 2020; Health and Safety Policy for the Resumption of Gaming Operations Nonrestricted Licensees posted May 27, 2020; Procedures for Reopening after Temporary Closure Due to COVID-19 posted April 21, 2020, Gaming Control Board. Such additional regulatory policies set forth requirements related not only to the social distancing and placement of table games or slot machines in the casino, for example, but they also set forth requirements regarding training of the employees, financial operations and other internal operations of casinos. Id. These casinos are also subject to regular and explicit inspection of all aspects of the respective casino's reopening plan. Id. Indeed, gaming companies are one of the few categories of organizations in which the directive specifically discusses enforcement and punishment alternatives for violating the directive and concomitant promulgated regulations. Emergency Directive, §35.  Casinos are therefore subject to heightened regulation and scrutiny

-6-

under these guidelines in comparison to churches, regardless of the difference in occupancy cap. The Court finds that while Calvary focuses on the fifty-person cap, it fails to consider the totality of restrictions placed upon casinos in their comparative analysis. Thus, even if the Court were to accept casinos as the nearest point of comparison for its analysis of similar activities and their related restrictions imposed by the Governor, the Court would nonetheless find that casinos are subject to much greater restrictions on their operations and oversight of their entire operations than places of worship.

The Court also finds that other secular entities and activities similar in nature to church services have been subject to similar or more restrictive limitations on their operations. The Court notes that church services consist of activities, such as sermons and corporate worship, that are comparable in terms of large numbers of people gathering for an extend period of time to lectures, museums, movie theaters, specified trade/technical schools, nightclubs and concerts. All of these latter activities are also subject to the fifty-person cap or remain banned altogether under Emergency Directive. See Emergency Directive, §§ 20, 22, 27, 30, 32. Given that there are some secular activities comparable to in-person church services that are subject to more lenient restrictions, and yet other activities arguably comparable to in-person church services that are subject to more stringent restrictions, the Court cannot find that the Emergency Directive is an implicit or explicit attempt to specifically target places of worship. Lukumi, 508 U.S. at 534 (striking down city council ordinance that specifically targeted and forbid animal sacrifices made by a particular religious group). Additionally, whether a church is more like a casino or more like a concert or lecture hall for purposes of assessing risk of COVID-19 transmission is precisely the sort of "dynamic and fact-intensive" decision-making "subject to reasonable disagreement," that the Court should refrain from engaging in. South Bay, 2020 WL 2813056, at * 1. As the Court

finds that the Emergency Directive is neutral and generally applicable, there is no facial Free Exercise challenge, and Calvary has therefore not demonstrated a likelihood of success on the merits of this claim.

### b. As-Applied Free Exercise Challenge: Selective Enforcement

In its briefing Calvary also brings an as-applied challenge selective enforcement claim. Specifically, Calvary points to statements made by the Governor and the Attorney General regarding recent protests to argue that the section of the Emergency Directive banning more than fifty people from gathering, whether inside or outside, is not being enforced against secular activity. Calvary also includes photographs from casinos which appear to indicate violations of the social distancing requirements of the Directive and photos from Fremont Street in downtown Las Vegas in which it appears that far more than fifty people have gathered.

First, the Court is not persuaded that outdoor protest activity is similar to places of worship in terms of the nature of the activity and its ability to be regulated. Outdoor protests involve dynamic large interactions where state officials must also consider the public safety implications of enforcement of social distancing. That is to say that such enforcement could result in greater harm than that sought to be avoided by the Directive. The choice between which regulations or laws shall be enforced in social settings is a choice allocated generally to the executive, *not* the judiciary, absent clear patterns of unconstitutional selective enforcement.

Moreover, the Court finds that Calvary has not provided a sufficient evidentiary basis for its as-applied challenge. For a selective enforcement claim, it is not enough for Calvary to demonstrate that the directive is intermittently not being enforced against secular activities. Calvary must also demonstrate that Defendants are *only enforcing* the directive against places of worship. See Stormans, Inc v. Wiseman, 794 F.3d 1064, 1083 (9th Cir. 2015) (finding no evidence

of selective enforcement against religiously affiliated pharmacies in enforcement of drug delivery rules). The Plaintiffs have not presented evidence of such a pattern of selective enforcement. While images of crowded casinos attached to its submission may raise a potential future issue of selective enforcement, the Court must have more evidence than this to find a likelihood of success on the merits of a selective enforcement claim.

The Plaintiff's selective enforcement claim is premature. The story of the enforcement of these directives has yet to be written. Indeed, the primary official tasked with enforcing the Emergency Directive in Lyon County is the Lyon County Sheriff. Defendant Sheriff Frank Hunewill has indicated through counsel that he has no intention of using limited law enforcement resources to enforce the directive against Calvary or other places of worship. Calvary has presented no evidence indicating that it has been subject to actual enforcement by the Sheriff or any other law enforcement officer. Calvary therefore has not demonstrated a likelihood of success on the merits of its selective enforcement claim. If Calvary does in fact have evidence of selective enforcement against it, nothing in this order shall prohibit it from returning to the Court with that evidence and filing a new motion for a preliminary injunction.

/ / /

### VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Emergency Motion for Temporary Restraining Order and Emergency Motion for Preliminary Injunction (ECF Nos. 9, 19) are DENIED.

**IT IS FURTHER ORDERED** that the Motion for Leave (ECF No. 41) is DENIED without prejudice. The Court does grant Plaintiff leave to file a new subsequent motion for injunctive relief in which it may provide more evidence for an as-applied challenge to the Emergency Directive. The Court finds that full briefing would be appropriate for consideration of any additional evidence presented by any party.

DATED June 11, 2020.

_____
**RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE**